453 A.2d 310

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

**v.**

**Alfonso A. TUMINI, Respondent.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1982.

Decided Dec. 14, 1982.

John W. Herron, Asst. Discipl. Counsel, Philadelphia, for petitioner.

John R. McConnell, Philadelphia, for respondent.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY and HUTCHINSON, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

The Disciplinary Board of the Supreme Court of Pennsylvania [hereinafter cited as "Board"] recommended that respondent, Alfonso A. Tumini, be disbarred from the practice of law in the Commonwealth for violations of Disciplinary Rules 1–102(A)(3), (4), (5), (6), 1–103(A), and 7–102(A)(3) and (8).[1]

---

**1.** "DR 1–102(A)(3), (4), (5) and (6) provide,
 "(A) A lawyer shall not:
 * * * * * *
 "(3) Engage in illegal conduct involving moral turpitude.

On May 5, 1981, a Petition for Discipline was filed against respondent by the Office of Disciplinary Counsel. Hearings were held before Hearing Committee 1.02 [hereinafter cited as "Committee"] on August 4 and 5, 1981, and on January 20, 1982, the Committee unanimously recommended that respondent be disbarred from the practice of law. Exceptions were filed to the recommendation of the Committee, and a three-member panel of the Board heard oral argument. On June 11, 1982, the Board issued its report and recommendation, which adopted the Committee's findings of fact and conclusions of law, and concurred in the Committee's recommendation that Respondent Tumini be disbarred from the practice of law.

Pursuant to Pa.R.D.E. 208(e)(2) we granted respondent's request for oral argument on July 6, 1982. Following argument on October 21, 1982, a thorough review of the record, and careful consideration of the arguments raised in respondent's brief, we conclude that disbarment is the appropriate sanction in this matter.

The following facts are pertinent. Through his activities in The Order of Brotherly Love, a fraternal organization, respondent met Anthony D. Pirillo, a formerly admitted attorney who was then president of the organization. Pirillo became Tumini's closest friend and mentor, guiding him

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

"DR 1–103(A) provides,

"(A) A lawyer possessing unprivileged knowledge of a violation of DR 1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

"DR 7–102(A)(3) and (8) provide,

"(A) In his representation of a client, a lawyer shall not:

\* \* \* \* \* \*

"(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

\* \* \* \* \* \*

"(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

through college and law school, and eventually hiring him to work in his law firm; first as a law clerk and later, in October, 1975, when Tumini was admitted to the bar, as an associate. In 1974 or 1975, Pirillo introduced Mr. Tumini to Augustine A. Salvitti, who was the Executive Director of Philadelphia Redevelopment Authority [hereinafter cited as "Authority"] at the time. In fact, at Pirillo's request, Salvitti hired respondent to work at the Authority while Tumini concurrently was employed by Pirillo.

Respondent's association with Pirillo and Salvitti led to his being involved in illegal activities. In late 1975, respondent "laundered" checks for Salvitti which totaled approximately $10,000.00. The checks were drawn on the accounts of various contractors with the names of the payees left blank. Respondent cashed and delivered the money to Salvitti in such a way as to leave no record of Salvitti's receipt of the money.

Another transaction arose out of litigation between the City of Philadelphia and Penrose Industries, Inc. [hereinafter cited as "Penrose"]. In December, 1973, Salvitti was appointed Executive Director of the Authority. At that time Philadelphia was involved in litigation with Penrose over a substantial piece of commercial property leased by Penrose. The Authority brought foreclosure proceedings against Penrose based upon Penrose's default on the lease. Penrose sued the Authority and the city claiming there were mitigating circumstances for the default. The Authority proposed to make a monetary payment to Penrose in order to settle the litigation and obtain clear title to the property. Salvitti told William Sylk, president of Penrose, that settlement would be facilitated if Pirillo was hired as counsel for Penrose. Once Pirillo was retained by Sylk, Salvitti and Pirillo conspired to inflate the settlement.

All money was placed in escrow and remained there from 1974 until disbursements to Pirillo in early 1976. Pirillo received $93,500.00, representing his share from the settlement. Because of adverse publicity, Pirillo and Salvitti agreed that Pirillo would declare the money as a legal fee

for federal income tax purposes, pay the taxes on it, and thereafter evenly divide the remainder with Salvitti. On March 30 and May 7, 1976, Tumini, at Pirillo's request, delivered cash payments of $15,000.00 and $12,500.00 to Salvitti. Respondent admitted knowing that the payment constituted a bribe of a public official.

The Penrose transaction became the subject of a federal grand jury investigation for which respondent was subpoenaed. After invoking his privilege against self-incrimination, Tumini was granted immunity from prosecution by the United States District Court. At Pirillo's request, respondent gave perjured testimony in which he denied knowledge of the fee-splitting arrangement between Pirillo and Salvitti, and of the March 30 and May 7 deliveries of cash to Salvitti. Afterward, respondent learned that Sylk, who had also given perjured testimony, had recanted his previous testimony and told the truth about the Penrose transaction. Under threat of prosecution for perjury, respondent recanted his own perjured testimony and cooperated with the grand jury investigation and the federal government's subsequent prosecution of Salvitti.[2]

 The standard of review vested in this Court in disciplinary matters is *de novo*. *Office of Disciplinary Counsel v. Kissel*, 497 Pa. 467, 442 A.2d 217 (1982); *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616 (1975). Disciplinary sanctions "are not primarily designed for their punitive effects, but for their positive effect of protecting the public and the integrity of the courts from unfit lawyers." *In re Berlant*, 458 Pa. 439, 441, 328 A.2d 471, 473 (1974).

 Respondent Tumini does not deny the allegations of misconduct. Rather, he argues that disbarment is inappropriate and excessive punishment for his actions. In support of this claim Tumini asserts that he was indebted to Pirillo

**2.** Salvitti was convicted and sentenced to serve three years in a federal penal institution and to pay a fine of $38,000.00. Pirillo, who also testified against Salvitti as an immunized government witness, was disbarred on consent by order of this Court dated June 7, 1978.

and Salvitti and placed in a "cruel" situation when faced with testifying before the grand jury.

> "At this juncture, respondent was faced with a cruel dilemma. Either he had to commit perjury in violation of the law and the Code of Professional Responsibility, or he would have to completely destroy, both professionally and socially, the only two benefactors he had ever had.
>
> "In the end, after much anguish, his loyalty prevailed over his integrity and he consequently conducted himself as admitted above."

Brief for respondent at 5. Further, Tumini argues that he did not personally gain from his participation in the unlawful transactions, and that he reported the violations of the law when they became publicly known.

It cannot be said that respondent had nothing to gain in conducting himself as he ultimately chose to do. Mr. Tumini, instead, benefitted financially and professionally. His salary at the Authority was approximately $17,500.00. Additionally, he earned between $7,000.00 and $9,000.00 in his legal practice with Pirillo. Respondent continued to foster his professional and social contacts by remaining friends with both Pirillo and Salvitti.

The Committee also properly rejected respondent's allegation that his misconduct resulted from his youth and inexperience.

> "He was more knowledgeable and sophisticated about the Philadelphia political scene and certain aspects of the Philadelphia criminal court system than are many lawyers who have practiced for a far longer period of time. He acquired this knowledge through constant professional and social interaction with Augustine A. Salvitti and Anthony Pirillo, Jr., who not only provided Respondent with employment but also provided him with continuous contacts and information about these subjects."

Committee Report at 22.

As previously noted, respondent's conduct involved "laundering" checks for Salvitti and delivering cash from Pirillo to Salvitti, illegal conduct itself which demands severe sanc-

tions since respondent knew at the time that at least one of the cash deliveries constituted payment of a bribe to a public official. However, when required to testify before an investigating grand jury, respondent willingly conspired with Pirillo to lie under oath on March 4, 1977.

> "False swearing in a judicial proceeding is certainly an egregious species of dishonesty and is surely also patently prejudicial to the administration of justice. This is doubly so when it is a lawyer who is the perjurer."

*Montgomery County Bar Association v. Hecht,* 456 Pa. 13, 21, 317 A.2d 597, 602 (1974) [footnote omitted].

This Court considered the appropriate sanction for two attorneys who, *inter alia,* requested and advised clients to testify falsely before the investigating judge in a Special Judicial Investigation in *In re Oxman,* 496 Pa. 534, 437 A.2d 1169 (1981). We considered their efforts to obstruct the administration of justice particularly offensive.

> "[M]ost seriously, in requesting witnesses to testify falsely in an effort to impede the Special Judicial Investigation, appellants have breached their ethical duties and have violated the public trust. We particularly condemn appellants' reprehensible efforts to obstruct the administration of justice. See *Office of Disciplinary Counsel v. Campbell,* supra; *Montgomery County Bar Association v. Hecht,* 456 Pa. 13, 317 A.2d 597 (1974). Because the record before us reveals a deplorable disregard for the integrity of the judicial process, we are compelled to conclude that appellants are unworthy of the public trust and confidence vested in them as members of the legal profession."

*Id.,* 496 Pa. at 545, 437 A.2d at 1174–75.

It is important to remember that Tumini's recantation of his perjured testimony was not voluntary, but was compelled under direct threat of a criminal indictment following Sylk's recantation and respondent's implication.

> "In choosing an appropriate punishment, this [sic] is no doubt that dishonesty on the part of an attorney establishes his unfitness to continue practicing law. Truth is the cornerstone of the judicial system, a license to practice law

requires allegiance and fidelity to truth. Respondent's false swearing and dishonest conduct are the antithesis of these requirements. We deem disbarment to be the appropriate remedy for false swearing."

*Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 200, 425 A.2d 730, 733 (1981).

Mr. Tumini's delivery of cash payments to Salvitti, knowing that at least one constituted a bribe of a public official, his false swearing before the grand jury and failure to cooperate with a criminal investigation while an immunized witness, and his failure to recant his false testimony until faced with the possibility of an indictment for perjury convince us of the appropriateness of the sanction of disbarment. "Respondent's choice of loyalty over integrity must result in a recommendation of disbarment." Report of Disciplinary Board at 14.

Accordingly, respondent is hereby disbarred from the practice of law within the Commonwealth of Pennsylvania and shall comply with Pa.R.D.E. 217.

McDERMOTT, J., did not participate in the consideration or decision of this case.