## In Re Anonymous No. 16 D.B. 82

Disciplinary Board Docket No. 16 D.B. 82.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SCHWARTZMAN, *Member*, November 20, 1984 — Pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d)(2)(iii), the Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

### HISTORY OF PROCEEDINGS

This matter was heard before hearing committee [　] on a petition for discipline filed by petitioner on March 23, 1982. The petition charges respondent with violations of the Code of Professional Responsibility (the Code) arising out of his involvement in events relating to a federal criminal investigation known as Abscam. Respondent filed an answer to the petition on April 29, 1982 and the case was heard before a two-member panel[1] of the hearing

---

1. By agreement of the parties, pursuant to Rule 206(a), Pa. R.D.E.

committee on August 24, September 16, October 4 and 12, and November 9, 1982.

The petition, in Charge I, charges respondent with disciplinary violations relating to his participation in transactions relating to and receipt of funds derived from payments of illegal gratuities to public officials by persons purporting to be representatives of an Arab sheik seeking assistance with future immigration and investment plans. Charge II alleges respondent's participation in the laundering of funds received from the representatives through the books of respondent's law firm. In Charge III respondent is charged with violations of the code arising from his impersonations of an official of the Immigration and Naturalization Service. Charge IV relates to respondent's failure to disclose his unprivileged knowledge of disciplinary violations by other members of the bar relating to the Abscam transactions.

## I. SUMMARY OF THE CHARGES

The matter is directly related to the so called Abscam investigations. Respondent was a partner in the law firm of [A], [B], [C], [D] and respondent]. [A], ("A") and [B] ("[B]") were indicted in a number of different matters and were ultimately found guilty of certain criminal acts. Respondent was not indicted. Respondent voluntarily cooperated with the federal authorities. [A] gave respondent funds from time to time, totalling approximately $20,000, which funds came from FBI undercover agents. Respondent repaid said funds to the United States Government.

### A. CHARGE I

Charge I relates to various meetings between [A] and several public officials and other undercover

FBI agents (including a private individual, ⌊E⌋) posing as representatives of an arab sheik. Monies were paid to [A] for arranging introductions and meetings. Respondent received a part of such funds from [A]. The hearing committee found that respondent violated certain disciplinary rules when he accepted these payments.

## B. CHARGE II

This charge involves the alleged participation of respondent in the laundering of funds received from representatives of the sheik. The issue was the purpose for the formation of [F], a Bermuda corporation, by [A]. The hearing committee found that respondent did not violate any Disciplinary Rules as to Charge II.

## C. CHARGE III

This charge involved respondent's impersonation of an official of the Immigration and Naturalization Service. The hearing committee found that respondent did violate certain Disciplinary Rules when he went to a meeting and identified himself as an official of the Immigration and Naturalization Service.

## D. CHARGE IV

This charge involves respondent's alleged knowledge of conduct of [A], [B] and Councilman [G], which conduct allegedly violated the Disciplinary Rules, and respondent's own conduct which allegedly violated Disciplinary Rules and respondent's failure to disclose same to Disciplinary Counsel. The hearing committee determined that this charge was in fact a repetition of alleged violations of Disci-

plinary Rules contained in other charges and therefore should not rise to a separate charge.

While the hearing committee found that respondent had violated Disciplinary Rules with respect to Charges I and III, it also concluded that the major reason for respondent's participation in the entire matter was his very close, dependent relationship with [A] and the resulting poor judgment in many instances. Respondent also cooperated with the government before any agreement was made. However, the conduct of respondent was serious. Therefore, the hearing committee recommended that respondent be suspended from the practice of law by the Supreme Court for a period of one year.

## II. STATEMENT OF THE CASE
### A. CHARGE I

Respondent was charged with violating the following Disciplinary Rules: 1-102(A)(3), 1-102(A)(4), 1-102(A)(6), 1-103(A), 2-106(A), 3-102(A) and 9-101(C).

Respondent received payments from [A] on a number of occasions. Respondent knew that the funds were paid by representatives of an arab sheik who made the payments in exchange for introductions and meetings with elected officials. Based on his knowledge of the source of the funds and the purpose involved, the hearing committee concluded that respondent violated Disciplinary Rules 1-102(A)(3), 1-102(A)(4) and 1-103(A).

### B. CHARGE II

Respondent was charged with violating the following Disciplinary Rules: 1-102(A)(3), 1-102(A)(4), 1-102(A)(6) and 1-103(A).

Disciplinary Counsel alleges that the purpose for the formation of the [F], was to receive and launder

monies paid to [A] and Mayor [H] from the Arab sheik. Assuming that the foregoing was correct, the hearing committee concluded that Disciplinary Counsel had not proved that respondent, at the time, was aware that the corporation had been formed for an illicit purpose, and that respondent committed any act in furtherance of that illicit purpose. Therefore, the hearing committee concluded that respondent violated Disciplinary Rules 1-102(A)(3) and 1-102(A)(4).

## C. CHARGE III

Respondent was charged with violating the following Disciplinary Rules: 1-102(A)(3), 1-102(A)(4), 1-102(A)(6) and 9-101(C).

Respondent admitted that he had attended a meeting in Washington, D.C. at which meeting he introduced himself as [I] or [I, different spelling], an alleged official of the Immigration and Naturalization Service. The meeting was taped by the FBI. Respondent contended that all of the participants at the meeting were supposed to know that he was not that official. While respondent's contention is believable under the circumstances, it does not excuse his conduct. Therefore, the hearing committee concluded that respondent violated Disciplinary Rules 1-102(A)(3) and 1-102(A)(4).

## D. CHARGE IV

Respondent was charged with violating Disciplinary Rule 1-103(A).

Disciplinary Counsel alleges that respondent's conduct violated certain Disciplinary Rules, that the conduct of [A], [B] and Councilman [G] violated certain Disciplinary Rules and that respondent knew that the conduct of the three named persons violat-

ed Disciplinary Rules. Respondent failed to disclose his knowledge of said conduct to Disciplinary Counsel. The hearing committee concluded that these charges were included in Charges I and II and should not be treated as additional violations of the Disciplinary Rules.

## III FINDINGS OF FACT:

### A. CHARGE I

1. Respondent is an attorney admitted to practice in the Commonwealth of Pennsylvania in 1968.

2. In December, 1968, respondent met [A] and subsequently accepted an offer of employment with the law firm of [   ], [A] and [B].

3. In 1973, respondent became a partner and thereafter in 1976 the firm name was changed to [A], [B], [C], [D] and [respondent].

4. Almost from the beginning, respondent had a close practically exclusive working relationship with [A], whose practice consisted primarily of corporate, real estate and commercial matters.

5. In the early part of 1979, [A] was involved with a man named [J] who leased certain property with an option to buy in Atlantic City, New Jersey. [J] was looking for someone to either build a hotel casino on the property or who would purchase it.

6. Everyone in the office at that time was aware that [A] was trying to find financing for the [J] property or a purchaser for the land, and everyone in the office assisted in this effort.

7. Through a friend of [B], [A] learned that Mayor [H], of [   ], knew of some Arabs who had money and who were looking for this type of investment.

8. [H] (who was also a [   ] State Senator) advised [A] that money could be made by introducing con-

gressmen to the Arab sheik's representatives who would explain the sheik's position.

9. The relationship between [J] and [A] as individuals was then formalized into a written agreement. Respondent in cooperation with [J's] attorney, prepared the agreements and he was paid for the time involved in their preparation and negotiation. The law firm has no interest in the agreements whatever.

10. Two agreements were prepared, one if an investor was secured and the other in the event a purchaser for the land was secured.

11. On July 26, 1979, [A], [H] and [B] met with the sheik's representative. Blueprints, feasibility studies, accounting reports, engineering studies and construction estimates relative to building a casino were taken to the meeting.

12. Following the meeting of July 26, 1979, [A] returned to the office and told everyone about it. Respondent was told that the sheik's representatives were interested in immigrating to the United States. In this connection, the sheik was concerned that there may be a revolution in his own country and he wanted to meet with different people to find out about the details for immigrating to this country.

13. Respondent was told by [A] that the sheik wanted to meet important people; that in his country the custom was to see the individual that was responsible for producing the desired result. Accordingly, here in the United States the sheik's representatives wanted to meet people who could do the sheik some personal good if ever the need arose and the sheik sought to reside in this country. He wanted to be in the position to call upon a "friendly face" in the event of a revolution in his own country. Congressmen were his idea of people of importance that he wanted to give money to and to whom he

could and would explain his position in the event there was a future need to do so and they were called upon. Respondent was told by [A] that Arabs would not meet with anyone unless they took money; that that was like sealing the meeting or introduction. Based upon what he was told respondent believed this was the way Arab people did business.

14. Most of the information with respect to the "dealings" with the sheik's representatives respondent derived from [A]. That is to say, that [A] was respondent's source of information regarding the relationship between the sheik's representatives and the congressmen and others.

15. Respondent learned at a meeting with [B] and [A] that Congressman [K] was interested in meeting with the sheik and that [A] would share in any payment [K] received.

16. Regarding the purpose for the payment, respondent understood that the sheik expected to be greeted by a "friendly face" if the need arose in the future. Respondent interprets this to mean someone "beholden" and "receptive" to the sheik's position at some future time.

17. Respondent did not believe that the payment or acceptance of the money by the congressmen was illegal since they, to his knowledge, were only being asked to sit and listen to the sheik's position.

18. The meeting with Congressman [K] generated a payment of $50,000 to [K].

19. Respondent learned about the payment when [A] returned to the office. He was advised and involved in how some of the money would be divided. [A] also determined that respondent's share of the payment would be $4,500.

20. Respondent accepted what [A] gave him because he worked with [A] for 10 years. He presumed that [A] felt that he was entitled to the money be-

cause of their relationship. Since June or July, 1979 when the interest in Atlantic City developed [A] spent very little time in the office. Respondent was doing the legal work and responding to the needs of clients. By so doing he continued to generate legal fees for the office.

21. Respondent placed the $4,500 in his safe deposit box at [M] Savings and Loan.

22. Respondent became aware that Congressman [L] was willing to meet with the sheik's representatives for a $5,000 political contribution.

23. In September, 1979, [A] returned from New York City the day after the meeting with Congressman [L] and the sheik's representatives, and gave respondent another $4,500 saying, "This is for you." There was no discussion of the reason for giving respondent the $4,500 and he did not question it. Rather, he accepted it with appreciation and placed it in his safe deposit box at [M] Savings and Loan. [A] also shared with him information concerning the amount he and [B] received.

24. Respondent placed Congressman [L's] $5,000 political contribution in a safe deposit box at [N] Savings and Loan that he shared with [A]. He later retrieved the money when requested. Both [A] and [B] kept their share of the proceeds in that safe deposit box.

25. Respondent became aware that [A] was arranging a meeting between Congressman [O] and the sheik's representatives.

26. On the morning after the meeting with Congressman [O] (which took place on or about October 10, 1979), [A] gave respondent $2,500, saying, "This is for you."

27. Respondent put the $2,500 in [M] Savings and Loan with the money he had received after the [K] and [L] meetings. Later, all of it was moved to

another safe deposit box that respondent had at [N] Savings and Loan.

28. After the October 20, 1979 meeting with Congressman [P], and the sheik's representatives, that was arranged by [A], respondent was told that everything went well and he was given another $2,500 represented to be his share.

29. The money respondent received after the [P] meeting was not deposited in any bank or institutional safe deposit box but used to pay for incidential household expenses and to purchase two pieces of sculpture.

30. Respondent learned from [A] that the sheik was interested in building a hotel in [   ] at a cost of between $50,000,000 and $100,000,000. The sheik wanted to be certain that the structure could be built in an atmosphere free of labor unrest and there would be no problems getting the necessary permits. To be assured of this he wanted to meet with people to make his position understood and to show his appreciation to them by paying for them to protect his (the sheik's) interests.

31. On or about January 18, 1980, a meeting took place between [   ] City Councilman [B] and the sheik's representative at the [Q] Hotel in [   ]. Respondent was not aware that the meeting was scheduled or planned.

32. The morning after the [B] meeting, [A] informed respondent that the meeting took place and the $25,000 was paid for the meeting. At that time [A] gave respondent $3,000, saying, "This is for you."

33. Respondent accepted the money and placed it in an account in the [R] Bank.

34. Respondent became aware of a meeting that took place between [   ] City Councilman [S] and

the sheik's representative after the meeting occurred.

35. After the meeting with [B], respondent became aware that the sheik's representatives wanted to meet with the President of the [  ] City Council who is [G]. They wanted to explain the sheik's position, to have a friendly face in [  ] and to know that he would not experience any difficulty in [  ] with respect to building a hotel in the city.

36. [A] gave respondent $3,000 of the proceeds he received from the [S] and [G] meetings with the sheik's representatives.

37. Said $3,000 was returned to the government by respondent's lawyer shortly after its receipt.

38. Respondent accepted the money because he was handling the office for [A] and [B]. He performed the back up work for their clients as well as his own.

39. In the case of all of the introductions [A] arranged for the sheik's representatives, there was never any mention to respondent that the people being introduced had to do anything for the payment or that they were otherwise promised anything. According to respondent, [A's] expression was always "no quid pro quo". It was merely the Arab manner of doing business.

40. The total amount of money respondent received was $20,000. Before June, 1980 all of the money he received was returned to the government.

41. Respondent did not notify the Disciplinary Board that [A], [B] or [G], all lawyers and members of the Pennsylvania Bar, were in violation of the Code of Professional Responsibility because he did not view their conduct as being in violation of the rules based upon the information he had with respect to what was going on.

42. Respondent wondered why someone would pay large sums of money for mere introductions and mentioned it to [A]. However, he was told that there was no promise, no quid pro quo and no official act to be performed. The purpose was to appear before a friendly face that would be receptive to listening to the sheik if there were ever a need. The amount of money was explained as insignificant in relation to the sheik's $400,000,000 credit line in the [T] Bank in New York City.

43. When contacted by the FBI, respondent cooperated fully before and after a grant of immunity. His cooperation was not contingent upon any agreement that could be struck regarding his involvement in the affair. Much of the information he shared was new and all of it was true in every sense.

44. Respondent's cooperation was not limited to providing information but extended to testifying at several trials and other hearings involved in the prosecution of Abscam defendants.

### B. CHARGE II

45. Respondent was not aware that [F] had been formed by [A] for any illicit purpose.

46. Respondent believed that the purpose of the corporation was to serve as a vehicle for investment of expected fees [A] would receive if he located a purchaser or helped to secure financing with respect to certain property in Atlantic City, New Jersey.

47. Such fees, if received, would not have been unlawful.

### C. CHARGE III

48. At the request of [A] and [H], respondent attended a meeting in Washington, D.C. with representatives of the Arab sheik.

49. At that meeting he represented himself as [I] or [I, different spelling], an official of the United States Immigration and Naturalization Service.

50. Respondent was advised by [A] and [H] that all of the participants at the meeting knew that respondent was not an official of Immigration and Naturalization Service.

51. At the meeting respondent, posing as [T], explained certain areas of immigration law.

52. At the meeting in Washington, D.C. respondent became aware of the fact that at least one of the representatives at the meeting did not know that respondent was not an official of the Immigration and Naturalization Service.

53. No funds were paid to respondent at that meeting.

## D. CHARGE IV

54. At all relevant times, respondent did not believe that any action by himself, [A], [B] or [G] violated any Disciplinary Rules.

55. The violation alleged was included in Charges I and II and should not be treated as additional violations of the Disciplinary Rules.

## IV DISCUSSION

## A. CHARGE I

The evidence related to the first charge establishes that respondent knowingly received and accepted a portion of payments made to public officials. Specifically, following a trip to Florida by [A], and two public officials, it was suggested to [A] that the Arab sheik was interested in meeting various public officials. The sheik wanted to meet a so-called "friendly face". The specific information was

given to the respondent by [A]. Respondent's understanding was set forth in his testimony.

"A. He wanted to meet people of importance, people that would be important to him. In his country if he wanted to do something, you saw the person who was responsible for that thing and that's the way you did it. He wanted to see Congressmen and explain his position to say that his country had been friendly to the United States. He wanted to be able to come into this country if there was a revolution in his country. He wanted them to understand his position and to have a friendly face. He didn't want a revolution to be occurring in his country and then dial the phone and start to try to find somebody. He wanted to be able to call and say I have met you before, can you help me.

He was concerned that if you wait to a later time it is too late to make a phone call. It was my understanding he wanted to have a friendly face, people he had met, people he had given money to. That was his way of doing business. He wanted to be introduced to Congressmen, to people who could help him explain his position and what he wanted."

"Q: Was there ever any mention of a quid pro quo or anything like that in return for this?

A. No, just ——

Q: A return for the payment of the money, I am talking about.

A: No. I was told by [A] the payment of money was because the Arabs would not meet with a person unless he took money. In other words, that was like sealing the meeting, the introduction. That's what they do. This is the way they do business. If you didn't want to take the money there would be no meeting."

It is obvious from the testimony that whereas the money may have been paid to [A] for making and ar-

ranging introductions, the purpose of it was to assure that the public officials would be a "friendly face" to the sheik in the event that he called upon them in the future. There was as much of a quid pro quo in the relationship between the sheik and the public officials as there was between the public official and [A]. The fact that respondent's law firm anticipated being involved in doing any legal work in connection with the possibility of casino construction or land transactions is enough of a quid pro quo to insure respondent's involvement. The bargained for exchange from the sheik's point of view was the assurance that the public officials who received the payment would cooperate and make it easier for him to accomplish his future objectives. This may well be the Arab way of doing business with public officials. However, it is not an accepted way of doing business under our system of government. Respondent, as a lawyer, knew or should have known that the purpose for the payments was tainted with impropriety as well as illegality. A lawyer is expected to know and appreciate the nature and extent of his involvement in activities such as these. He should have known the purpose of the introductions was illegal.

Even though respondent was not in active participation in [A's] overall scheme, he did in fact know that his partners were attempting to identify public officials to introduce to the sheik's representatives. He also knew the purpose for the introductions and that payments would be made for each meeting. Finally, he placed a public official's share of the "finder's fee" in safe keeping until requested to retreive it and was present during discussions concerning the divisions of various payments.

The effect of all the evidence presented is to substantiate respondent's violation of Disciplinary

Rules 1-102(A)(3), (relating to conduct involving moral turpitude); 1-102(A)(4), (relating to conduct involving dishonesty); and 1-103(A), (relating to the possession of unprivileged knowledge of a violation of Disciplinary Rule 1-102 that was not reported to a tribunal or other authority).

## B. CHARGE II

Charge II involves allegations that the respondent participated in a scheme with [A] to launder monies received from Abscam transactions. Specifically, the charge relates to the formation of a company known as [F] in Bermuda.

Even if we assume for the purposes of argument, that the formation of [F] was improper or illegal, petitioner did not prove that respondent was aware of that purpose. The testimony establishes that respondent believed that [A] anticipated receiving a fee for finding a purchaser or financing with respect to certain real estate located in Atlantic City, New Jersey. It would not have been improper for [A] to be paid such a fee. In addition, it is not improper for an individual to establish a foreign corporation for investment purposes. In light of all the testimony and evidence, petitioner did not meet its burden of proof with regard to Charge II.

## C. CHARGE III

This charge involves respondent's posing as an official of the Immigration and Naturalization Service in Washington, D.C.

Respondent made a trip to Washington, D.C. In September of 1979 where he met with a government informant and an FBI agent. Respondent does not deny any of the factual allegations of this charge. In point of fact, it would be difficult for him

to deny the allegations inasmuch as the entire episode was video taped by the FBI.

There can be no defense to this charge. Respondent was not an official of the Immigration and Naturalization Service. He posed as such an official. This was wrong and constituted a clear violation of Disciplinary Rules 1-102(A)(3) and (4).

## D. CHARGE IV

This charge deals with respondent's failure to timely report information relating to the misconduct of two of his law partners and a public official, all of whom were lawyers.

The hearing committee concluded that petitioner did not meet its burden of proof with regard to this charge. This board agrees. in addition, Charge IV is a repetition of the other charges. A violation of Disciplinary Rule 1-103(A) was previously alleged in Charges I and II. Therefore, the facts allegedly supporting Charge IV do not rise to the level of a separate charge than those previously charged.

## V. CONCLUSIONS OF LAW

### A. CHARGE I

1. Respondent's acceptance of money from [A] under the circumstances involved illegal conduct, involving moral turpitude and was a violation of Disciplinary Rule 1-102(A)(3).

2. Respondent's aceptance of money from [A] under the circumstances amounted to conduct involving dishonesty, and was a violation of Disciplinary Rule 1-102(A)(4).

3. Respondent's acceptance of money from [A] under the circumstances evidenced his knowledge that [A] violated Disciplinary Rule 1-102. His failure

to report same to Disciplinary Counsel was in violation of Disciplinary Rule 1-103(A).

## B. CHARGE II

4. Petitioner has not met its burden of proof with respect to any alleged violations of the Disciplinary Rules.

## C. CHARGE III

5. Respondent's posing as an official of the Immigration and Naturalization Service was illegal conduct involving dishonesty, fraud, deceit and misrepresentation and violated Disciplinary Rule 1-102(A)(4).

## D. CHARGE IV:

7. The violation of Disciplinary Rule 1-103(A) was alleged with respect to Charges I and II.

8. The alleged violations do not rise to a separate charge.

## VI. RECOMMENDATION:

The Disciplinary Board recommends to the Supreme Court of Pennsylvania that respondent, [     ], be suspended from the practice of law for a period of one year.

In reaching this recommendation of the disposition of the matter, this board agrees with the statement of the hearing committee in this matter. That committee stated:

"The Hearing Committee emphasizes that it believes Respondent's judgment was beclouded by his extraordinary loyalty to [A]. Such loyalty, of course, may not excuse violations of the Disciplinary Rules. This factor was taken into consideration in deter-

mining the discipline to be accorded to Respondent. The hearing committee also considered the fact that respondent cooperated with the Government without any deal being first made. Respondent's cooperation was important to the Government's prosecution of the various cases, particularly those cases involving the Philadelphia officials. Respondent should not be criticized or penalized for seeking the advice of counsel and for following such counsel's advice in his dealings with the Government. Further, the hearing committee believes that it is highly unlikely that respondent would again engage in the conduct found to have violated the various Disciplinary Rules. We note that respondent has never been the subject of a complaint before the Disciplinary Board."

This board agrees with the reasoning of the hearing committee and adopts the same as the basis for its recommended disposition of this matter. The board further recommends that the costs be paid by respondent.

Messrs. Krawitz and Douglas did not participate in the adjudication.

Mrs. Hammerman and Messrs. Elliot and Curran dissent and would recommend that [respondent] be suspended from the practice of law for a period of three years.

## DISSENTING AND CONCURRING OPINION

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

ELLIOTT, *Vice Chairman,* November 20, 1984—By a majority vote, this Disciplinary Board of the Supreme Court of Pennsylvania found that respondent [    ] violated Disciplinary Rule 1-.102(A)(3) (relating to conduct involving moral tur-

pitude); 1-102(A)(4) (relating to conduct involving dishonesty) (on two charges) and 1-103A (relating to the possession of unprivileged knowledge of a violation of Disciplinary Rule 1-102 that was not reported to a tribunal or other authority), and recommended a one-year suspension on these charges arising out of the Abscam investigation. The same majority dismissed two additional charges against respondent that involved additional violations of the same Disciplinary Rules cited above, as well as a violation of Disciplinary Rule 1-102(A)(6) (relating to conduct that adversely reflects on a lawyer's fitness to practice law).

While I concur in the Disciplinary Rule violations found by the board, I dissent from the recommended discipline, and would also find additional violations of the Disciplinary Rules. As the board's findings of fact amply demonstrate, the underlying facts of respondent's conduct are not in dispute. Respondent defended this conduct by alleging that he did not realize his conduct constituted violations of the Disciplinary Rules and that his close ties to Attorney [A], the architect of the Abscam scandal, clouded his judgment. These factors were accepted by the hearing committee and the majority of the board in determining what disciplinary violations existed and in recommending only a one year suspension.

I cannot agree. Respondent's conduct clearly violated the disciplinary rules. Moreover, respondent's self-alleged lack of independent judgment is certainly not a reason to expedite his return to the practice of law. I recommend a minimum three year suspension. Board members Curran and Hammerman concur in the dissent.

## I. THE BOARD'S FINDINGS OF FACT

The board's findings basically recite the undisputed facts of respondent's conduct. However, certain specific findings (specifically numbers 17, 20, 41, 46, 47, 55 & 56) deal with the "justification" for respondent's conduct. In each case the board found that either respondent did not know that his conduct violated the disciplinary rules or he committed acts based on his relationship with Attorney [A].

These findings are simply irrelevant. It is incomprehensible that a lawyer would not realize that attempted bribery of a public official would violate the Code of Professional Responsibility. Moreover, respondent's relationship with Attorney [A] cannot justify his independent conduct in violating the Disciplinary Rules.

## II. THE BOARD'S DISMISSAL OF CERTAIN CHARGES

I would find several additional violations of disciplinary rules by respondent. First, as to Charge I, the majority did not find a violation of D.R. 1-102(A)(6) (relating to conduct that adversely reflects on a lawyers fitness to practice law). Under any interpretation of the Code of Professional Responsibility, respondent's admitted conduct adversely reflected on his fitness to practice law. This is particularly true when the majority found violations involving moral turpitude and dishonesty.

Secondly, I would find that respondent violated at least D.R. 1-102(A)(6) with respect to Charge II. It is clear that respondent knew of [F] and was aware of how payments were being recorded on law firm books. Respondent was also admittedly aware of Attorney [A's] role in the Abscam payoffs. Thus, if re-

spondent did not know that money was being laundered, it was only because he conveniently looked the other way. By his actions, respondent aided and abetted Attorney [A] in laundering the money. This is sufficient to establish a violation of the disciplinary rules. See In Re: Anonymous Nos. 41 D.B. 79 and 42 D.B. 79, 21 D. & C.3d 294 (1981).

## III. DISCUSSION

The Abscam investigation represents a sad epic, raising many questions about the candor and quality of law enforcement. Equally disturbing, however, was the resultant public perception that public officials were for sale and that lawyers stood ready to grease the wheels in return for a cut of the action.

The judicial system has reviewed the entire affair and those involved. However, no matter what the final determinations are regarding the guilt of the various Abscam defendants or the legality of the law enforcement effort, the public and the bar has a distinct concern. The Code of Professional Responsibility exists to maintain the integrity of our profession and to preserve the public's trust, which is an essential element of the legal profession.

The maxim that "ignorance of the law" is no excuse must apply with compelling force to lawyers who violate the Disciplinary Code and abuse their privilege of practicing law by perpetrating crimes. Lawyers know that facilitating bribery of public officials violates a lawyer's professional responsibility. Moreover, lawyers must demonstrate the independent judgment and strength of character to avoid blatantly unethical and illegal misconduct. The Supreme Court recently gave short shrift to the argument here advanced by respondent, adopting the finding of the Disciplinary Board that "Respon-

dent's choice of loyalty over integrity must result in a recommendation of disbarment." Office of Disciplinary Counsel v. Tumini, 499 Pa. 284, 453 A.2d 310, 314 (1982).

Respondent was an active and essential part of this illegal conspiracy. The board's majority found that "Respondent did not believe that the payment or an acceptance of the [bribe] money was illegal since, they, to his knowledge, were only being asked to sit and listen to the sheik's position." When a $50,000 payment was made to a congressman, respondent learned of it and himself took $4,500 in cash. Shortly thereafter when another congressman received a payoff, respondent also took another $4,500 in cash. The board's majority found that respondent was fully aware of the amounts of the payoffs to both congressmen. Respondent's safe deposit box also held the $5,000 payoff cash for a congressman. After another payoff to a third congressman, respondent took $2,500 in cash. When a city councilman was paid off, respondent took $3,000 in cash. When a second city councilman was paid off, respondent readied for yet another $3,000 in cash.

Respondent knowingly took $20,000 in cash in six separate installments following each bribe of a public official. Respondent's insensitivity to the incremental sale of his license to practice law makes his alleged "naivety" a cruel insult to the public and to the members of the legal profession.

Respondent's conduct assumes even more egregious proportions. He went to Washington, D.C. and impersonated an official of the U.S. Immigration and Naturalization Service. Respondent was video-taped by federal law enforcement authorities as he posed as [I] or [I, different spelling] promising representatives of an arab sheik that he could accommodate their immigration visa problems.

Respondent also actively participated with [A] in laundering Abscam money by forming [F]. The finding of the board's majority that respondent was not aware of the illegal enterprise which [F] was borne out of strained credulity, particularly in light of respondent's multiple illegal acts in furtherance of this massive conspiracy.

Respondent's illegal actions are an insult to the public and a discredit to the legal profession. They certainly merit more than a one year suspension from the practice of law. A one year suspension merely rewards and encourages this blatantly illegal conduct.

Nor does respondent's subsequent cooperation with law enforcement officials justify overly lenient discipline. As the board has stated:

"The board has considered that both respondents have cooperated with law enforcement authorities in connection with the prosecution of [A]. While such cooperation is laudable, it also involves an element of self-interest in lessening their respective criminal exposures, even where testimony is given without formal immunity. Respondent's cooperation clearly does not change the facts of their disciplinary violations and the board concludes that it should not affect the appropriate disciplinary recommendation in this case." In Re Anonymous Nos. 41 D.B. 79 and 42 D.B. 79, 21 D.&C.3d 294 (1981). Significantly, in that case which also involved attorneys taking acts to facilitate the bribing of a public official, the Supreme Court ordered three year suspensions after a board recommendation of a one year suspension.

## IV. CONCLUSION

For all of the foregoing reasons, the undersigned member respectfully requests your honorable court

not to accept the recommendation of the board relative to the imposition of discipline and to order the imposition of at least a three year suspension from the practice of law for respondent.

## ORDER

NIX, *C.J.*, And now, this December 21, 1984, upon consideration of the Report and Recommendation of the Disciplinary Board and the dissenting and concurring opinion dated November 20, 1984, it is hereby ordered that [respondent] be and he is suspended from the Bar of the Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Flaherty and Mr. Justice Papadakos dissent and would issue a rule to show cause why respondent should not be disbarred.