## Office of Disciplinary Counsel v. McCarrin

Disciplinary Board Docket no. 164 D.B. 2000.

To the Honorable Chief Justice and Justices of the Supreme Court in Pennsylvania:

WRIGHT JR., *Member,* March 8, 2006—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 28, 2000, by order of the Supreme Court of Pennsylvania, Michael W. McCarrin was placed on temporary suspension from the practice of law and the matter was referred to the Disciplinary Board. On July 15, 2003, Office of Disciplinary Counsel filed a petition for discipline against respondent. The petition charged respondent with professional misconduct arising out of his conviction of the crimes of mail fraud, money laundering and aiding and abetting. Respondent filed an answer to petition for discipline on October 1, 2003. On October 21, 2003, respondent filed a motion for temporary stay of proceedings. Petitioner filed a response on October 30, 2003. By order of the board chair dated November 21, 2003, the board granted respondent's motion and continued the disciplinary proceeding until respondent was released from prison.

On April 5, 2005, a disciplinary hearing was held before a District II Hearing Committee comprised of Chair Steven A. Bergstein, Esquire, and Members Mary Ann Rossi, Esquire, and Thomas M. Golden, Esquire. Respondent appeared pro se.

Following the submission of briefs by the parties, the Hearing Committee filed a report on September 30, 2005 and recommended that respondent be suspended for five years with credit from November 30, 2001.

No briefs on exception were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting on February 1, 2006.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is situated at Suite 1400, 200 North Third Street, Harrisburg PA 17101, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, Michael W. McCarrin, was born in 1949 and was admitted to practice law in the Commonwealth of Pennsylvania in 1978.

(3) Respondent is subject to the jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania. He has no prior record of discipline.

(4) In 1989 respondent moved to Media in Delaware County and worked as a sole practitioner doing personal injury work and some defense work.

(5) In 1991, Klaus Reinke, president and general manager of Potamkin automobile dealerships, moved into respondent's neighborhood and through the growth of that relationship Potamkin became one of respondent's clients.

(6) From 1991 through 1996, respondent handled legal affairs for Potamkin and Mr. Reinke.

(7) In 1994 respondent incorporated GKA Inc. to perform surveys concerning customer satisfaction with the sales and service of Potamkin's dealerships.

(8) Respondent listed himself as president and sole shareholder of GKA Inc., listed members of his family as GKA Inc.'s corporate officers, listed his Media residence as GKA Inc.'s corporate office, maintained a GKA Inc. bank account at PNC Bank, and operated GKA Inc. from his Media law office.

(9) The manner in which respondent formed and operated GKA concealed the fact and extent of the involvement of Klaus Reinke and his wife, Alice Reinke, and their financial interest in GKA.

(10) The customer satisfaction surveys were a vehicle to improve customer satisfaction by having the dealership, through GKA, contact the customer and resolve any issues with the vehicle or service so that when the manufacturer completed its own interview of the customer, the dealership would rate high enough to earn bonuses from the manufacturer.

(11) On August 17, 1999, the United States Attorney's Office for the Eastern District of Pennsylvania filed an indictment in the matter of *United States of America v. Klaus Reinke, Michael McCarrin, Anthony Solano,* charging respondent with violations of the federal crimes code as follows: title 18 U.S.C. §1341 (mail fraud), title 18 U.S.C. §1956 (laundering of monetary instruments), title 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specific unlawful activity), and title 18 U.S.C. §1952 (interstate travel in aid of racketeering).

(12) By jury verdict dated February 25, 2000, respondent was found guilty of nine counts of mail fraud and two counts of engaging in monetary transactions in property derived from unlawful activity and was acquitted of all other counts in the indictment.

(13) The jury found that respondent engaged in a scheme to defraud Potamkin of its intangible right to honest services and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

(14) The jury found that respondent used GKA to conduct customer satisfaction surveys of only Potamkin customers for approximately $50 per survey—more than 10 times the rate normally charged for such surveys—and secretly diverted a portion of the proceeds to Klaus Reinke by issuing checks disguised as "marketing services" payment to Alice Reinke, who performed no services for GKA and who was falsely listed as earning consulting fees for "marketing."

(15) The jury found that respondent billed Potamkin more than $461,928 between August 1994 and March 1996, for customer satisfaction surveys performed by GKA and concealed Klaus Reinke's role in GKA from the majority shareholders of Potamkin.

(16) The jury found that respondent attempted to obtain an additional $17,650 for customer satisfaction surveys, which Potamkin refused to pay after Mr. Reinke left as Potamkin's general manager.

(17) The jury found that although agents of GKA, operating from respondent's law office, earned nominal hourly fees, totaling approximately $26,504, respondent

and Klaus Reinke collected approximately $392,069 in GKA proceeds, which they divided among respondent, Klaus Reinke and Alice Reinke.

(18) The jury found that respondent caused GKA to bill Potamkin for some customer surveys that were incomplete or were never performed because GKA did not have an address or telephone number for the customer or had been unable to reach the customer and obtain a response to the survey questions.

(19) The jury found that respondent arranged for Potamkin to pay GKA's invoices, and demanded that Potamkin employees promptly issue GKA payments to respondent, who then distributed approximately $179,334 to Mr. Reinke in the form of "marketing services" payments to Mrs. Reinke.

(20) The jury found respondent kept approximately $212,735 in GKA's proceeds in the form of checks payable to himself, or checks from GKA to finance respondent's personal expenses, including the following: private school tuition for his children; life insurance premiums; furniture for his personal residence; a cruise through the rivers of France; personal credit card expenses; mortgage payments for his brother-in-law; federal income tax payments for himself and his wife; and for starting an automobile liquidating business controlled by respondent and his family members.

(21) The jury found that from September 1994 through July 1995, respondent and Klaus Reinke intentionally devised a scheme and executed the scheme by using the U.S. mail to send 11 checks totaling $108,678.68 from respondent's law office to Mrs. Reinke (which represented Mr. Reinke's share of GKA proceeds).

(22) The jury found that respondent periodically issued "draws" payable to himself from the proceeds of GKA.

(23) The jury found that respondent knowingly engaged in, and aided, abetted and caused, a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000.

(24) On October 19, 2000, the Honorable James T. Giles sentenced respondent to 24 months imprisonment, supervised parole for a term of two years, upon release from prison, restitution in the amount of $414,028, imposed jointly and severally with Mr. Reinke, to Lloyds of London, forfeiture in the amount of $31,289 to the United States, and a special assessment in the amount of $550.

(25) On October 27, 2000, respondent filed a direct appeal of his conviction.

(26) In January 2002, the United States Court of Appeals for the Third Circuit entered an opinion, affirming the judgment of conviction of the district court and remanding the case to district court for re-sentencing on restitution.

(27) In July 2002, after a hearing, Judge Giles reduced the restitution from $414,028 to $50,000.

(28) Respondent appealed Judge Giles' July 2002 amended restitution order.

(29) In December 2002, the Third Circuit affirmed Judge Giles' July 2002 amended restitution order and entered an opinion finding that the district court had properly balanced the amount of restitution, the amount of loss to the victim, and respondent's ability to pay the full

amount or part of it, present assets, present capability, as well as respondent's future ability to pay.

(30) In January 2003, the Third Circuit entered an opinion denying respondent's petition for rehearing.

(31) Respondent petitioned the United States Supreme Court for certiorari.

(32) In October 2003, the United States Supreme Court denied the petition.

(33) In November 2003, respondent began his incarceration.

(34) By order dated December 28, 2000, the Supreme Court of Pennsylvania placed respondent on temporary suspension from the practice of law.

(35) While serving his prison sentence, respondent requested, and the Disciplinary Board granted, respondent's request for a stay of proceedings until respondent was no longer incarcerated.

(36) In May 2005, respondent was successful in having the amount of his restitution reduced to $18,000 as a settlement with Potamkin's insurer, Lloyds of London.

(37) Respondent paid $18,000 on June 3, 2005.

(38) In November 2005, respondent was released from incarceration.

(39) At his criminal trial and at the disciplinary hearing, respondent denied that he intentionally entered a scheme to defraud Potamkin.

(40) At his criminal trial and the disciplinary hearing, respondent testified that he did not agree to enter into a corrupt agreement with Klaus Reinke.

(41) Respondent testified that he was solicited by Alice Reinke to set up a company that seemed to respondent to be a legitimate corporate interest and seemed worthwhile.

(42) Respondent testified at the disciplinary hearing that he "got involved in this because I was supportive of the Potamkin sales effort generally because [the] sales effort generated legal fees for me. It brought thousands of people in there." (N.T. 118.)

(43) Respondent saw GKA more as a money making vehicle for himself as opposed to his helping a client carry forward an idea.

(44) Respondent's testimony that the venture seemed legitimate is not credible.

(45) Respondent's contention that he innocently believed that his payments to Alice Reinke were justified where direct payments to Klaus Reinke would not have been justified is not credible.

(46) Respondent's contention that he was a "fall guy" for Klaus Reinke is not credible; as an attorney, respondent should have known that Klaus Reinke was acting in violation of his fiduciary duty to Potamkin by participating in the profits of GKA Inc.

(47) Respondent did not demonstrate sincere remorse at the disciplinary hearing and demonstrated a lack of appreciation of the ethical issues that were involved in his dealing with Klaus Reinke and GKA Inc.

(48) At the conclusion of the disciplinary hearing, respondent testified as to what he was sorry for was:

"Well, first of all, before I came into this, I had about a million and-a-half dollars in assets, and now I owe

$485,000 and I filed bankruptcy. I mean, my family was used to a really nice level of convenience. They went on vacations two times a year, they went to private school. My wife worked at the International French School and had lunch and champagne in the afternoon and now she's in a dungeon at Drew Elementary School with a totally different group of people. You know, there are people being arrested for using baseball bats and scissors and knives, and I'm responsible for that and I'm sorry for that. I did that. I was able to do certain things that were good, but—prior to the time I got involved in this, but I am responsible for all of this. It was bad judgment on my part." (N.T. 108-109.)

(49) Five character witnesses testified on behalf of respondent.

(50) Nelson Kardos, Michael O'Connor, Esquire, Harold Sparkler, Atiko Muttu, and John McCarrin testified to respondent's good reputation in the community for honesty and truthfulness.

(51) Respondent served with the military police in Viet Nam in 1967. While there, he participated in the rescue of a soldier who had been trapped underneath a car in a rice paddy. Respondent received a National Defense Medal and an Army Commendation Medal. Respondent was honorably discharged.

(52) Respondent was active in the community prior to his conviction.

(53) Subsequent to his release from prison, respondent obtained full-time employment at the *Philadelphia Inquirer* newspaper in the mailroom.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) Pa.R.D.E. 203(b)(1)—Conviction of a serious crime constitutes an independent basis for discipline.

(2) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely on his fitness as a lawyer.

## IV. DISCUSSION

Where a disciplinary proceeding is predicated on an attorney's conviction of a serious crime, the issue is whether the attorney's character, as shown by his conduct, makes the attorney unfit to practice law from the standpoint of protecting the public and the courts. *Office of Disciplinary Counsel v. Casety,* 511 Pa. 177, 512 A.2d 607 (1986). The board must give serious consideration to the events surrounding the conviction to determine the impact of the conviction on the appropriate measure of discipline to be imposed. *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 388, 441 A.2d 1193 (1982).

Respondent was convicted of nine counts of mail fraud and two counts of money laundering. His conduct with regard to GKA Inc. and the payments from Potamkin constitutes a serious breach of ethics and a troubling lack of insight. Respondent's conduct lasted for approximately two years; it resulted in a payment of $461,000 from Potamkin to GKA Inc., from which respondent realized a gain of at least $212,735. Respondent used his law office to perpetrate the illegal scheme.

Respondent was indicted for causing GKA Inc. to perform customer surveys at $50 each, which was 10 times above the typical amount charged for such a survey, and for making payments to Klaus Reinke by paying his wife, Alice Reinke, for marketing services which Mrs. Reinke did not perform. Respondent exercised poor judgment, which he admits. His judgment was clouded by the promise of easy money and the perception of the power and influence wielded by Klaus Reinke. Respondent's expression of sorrow centers on the personal financial consequences of his action, rather than real remorse for engaging in criminal and unethical activities.

In determining discipline, the Board and the Supreme Court look to prior decisions in similar cases in the interest of consistency so that similar misconduct is not punished in radically different ways. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). It is appropriate to consider aggravating and mitigating factors in determining discipline. The court has imposed sanctions ranging from a three-year suspension up to disbarment for conviction of mail fraud.

In the matter of *Office of Disciplinary Counsel v. Anonymous No. 21 D.B. 1996,* 174 Disciplinary Docket no. 3 (Pa. May 7, 1997), the respondent received a three-year suspension for a conviction of two counts of mail fraud. The respondent engaged in a scheme of submitting false medical reports to insurance companies. The purpose of the scheme was to inflate the insurance claim and receive more money from the insurance companies than was warranted. The respondent expressed limited remorse for his actions, concentrating on the embarrassment to his family. A four-year suspension was imposed

in the matter of *In re Anonymous No. 20 D.B. 81,* 35 D.&C.3d 202 (1985). That matter involved a respondent who was convicted of 13 counts of mail fraud and one count of conspiracy arising out of the submission of false claims to insurance companies to effectuate larger settlements for personal injury clients. In contrast to the above cited matter, this respondent expressed true remorse and had an impressive record of community activity both before and after his conviction.

The court did not hesitate to enter a five-year suspension for a single count of mail fraud, where the attorney had also suborned the perjury of his mother before a grand jury. *Office of Disciplinary Counsel v. Valentino,* 556 Pa. 609, 730 A.2d 479 (1999). The court entered a five-year suspension in the matter of *Office of Disciplinary Counsel v. Chung,* 548 Pa. 108, 695 A.2d 405 (1997). Mr. Chung was convicted of three counts of mail fraud after he engaged in a scheme of submitting false financial information on 30 occasions in order to obtain loans for his clients.

Likewise, disbarment has been imposed in egregious cases, such as in the matter of *Office of Disciplinary Counsel v. Tumini,* 499 Pa. 284, 453 A.2d 310 (1982). Mr. Tumini was disbarred for money laundering, bribing a public official, false swearing and perjury. Mr. Tumini demonstrated a fundamentally dishonest approach to the practice of law and the conduct of his professional relationships. He perjured himself before a grand jury and only recanted the perjured testimony under direct threat of a criminal indictment.

Here, respondent has expressed limited remorse, but does acknowledge that his conduct was grievous. He did

make restitution. Respondent enjoys a good reputation and is of good character. He served with distinction in the military and received an honorable discharge. He served his prison sentence. His conduct, while intentional, does not rise to the same level of deceit and duplicity evidenced by Mr. Tumini. Considering all of the circumstances in light of the criminal conduct, the board is persuaded that disbarment is not warranted. The board recommends a suspension of five years, retroactive to December 28, 2000, the date of respondent's temporary suspension.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, Michael W. McCarrin, be suspended from the practice of law for a period of five years retroactive to December 28, 2000.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Mr. Brown recused himself from the proceeding.

## ORDER

And now, May 25, 2006, upon consideration of the report and recommendations of the Disciplinary Board dated March 8, 2006, it is hereby ordered that Michael W. McCarrin be and he is suspended from the bar of this Commonwealth for a period of five years retroactive to December 28, 2000.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.