366 A.2d 563

OFFICE OF DISCIPLINARY COUNSEL

v.

Boyd H. WALKER, Respondent.

Supreme Court of Pennsylvania.

Argued April 1, 1976.

Decided July 6, 1976.

Rehearing Denied Aug. 18, 1976.

Blank, Rome, Klaus & Comisky, Edwin P. Rome, Norman Perlberger, Philadelphia, for petitioner.

Charles F. Lieberman, Asst. Discp. Counsel, A. B. Zerfoss, Chief Discp. Counsel, Harrisburg, for Board.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This is a direct review [1] of a recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania that respondent Boyd H. Walker be publicly censured by this Court for professional misconduct occurring during the administration of the estate of Rosa H. Henninger.

The essential facts of this case are undisputed. Rosa H. Henninger (Henninger), an 85 year old woman, executed a will and a revocable inter vivos trust in June of 1966. The will, executed on June 1, 1966, named Henninger's three nephews and a niece as residuary legatees and nominated the First National Bank of Allentown as executor and trustee under the will. The revocable trust, executed on June 16, 1966, placed all of Henninger's assets in the care of First National, the trustee. Hennin-

---

1. We hear this appeal under authority of Pa.Sup.Ct.R. 17–8(c). Respondent and the Office of Disciplinary Counsel requested oral argument in this case be held in camera by this Court. This motion was denied.

ger contacted respondent on July 7, 1966. Respondent reviewed the trust agreement and advised Henninger to revoke it. At her direction, he prepared a letter revoking the trust, hand delivering it to First National. First National, over objection, insisted on filing an accounting with the orphans' court before releasing the assets of the trust. An accounting was filed and the assets were released on February 6, 1967. In the adjudication approving First National's accounting, the orphans' court stated:

> "[W]e are of the opinion that in light of all of the surrounding circumstances the trustee was eminently correct in insisting upon filing an account and making distribution pursuant to an order of this court. . . . In fact, we may state that in all good conscience the trustee should not even have been importuned in the first instance to do other than it has done.

> ". . . Moreover, it is strongly recommended that serious consideration be given to this discussion [of counsel's obligations to the court when he finds himself representing a client who has become incompetent] by counsel who may in the future represent this settlor. While, on the basis of the court's preliminary inquiry, it has been concluded that the settlor presently still possesses sufficient capacity to manage her own affairs, the record contains a number of indications which suggest that such may not be the case for much longer. It, therefore, behooves counsel to act responsibly and conscientiously in fulfilling his obligation of loyalty to the court and to the client toward the end that the best interests of the latter, and her interests alone, will be served promptly and faithfully. This very certainly includes taking steps to procure the appointment of a guardian for her estate at the very first showing that she is no longer capable of handling her own affairs or is likely to dissipate her assets or become the victim of designing persons."

Respondent also drafted another will for Henninger. This will, executed on July 15, 1966, named two of Henninger's nephews and the niece as residuary legatees and named respondent and his father as co-executors. The third nephew, Walter Hunsicker, was given a specific bequest of $10,000 under this will. A codicil to the second will, executed January 25, 1967, revoked the $10,000 bequest to Walter. Finally, a third will, prepared by respondent and executed by Henninger on August 13, 1968, when she was 88 years old, designated Henninger's two nephews, the niece and respondent as equal residuary legatees and appointed respondent and his father co-executors of the will.[2]

Henninger died January 4, 1969, leaving an estate worth more than $2,000,000. Respondent, a beneficiary under the will and a co-executor of the estate, named himself attorney for the estate. On January 24, 1969, Walter Hunsicker, the disinherited nephew, contested the will by filing an appeal from probate. Respondent thereupon negotiated a settlement with Hunsicker.[3] The settlement, agreed to on October 15, 1969, called for $112,500, free of all state and federal taxes, to be paid to Hunsicker by the residuary beneficiaries. There is no evidence in the record that respondent informed the other residuary legatees that arranging the settlement was not one of his duties as either co-executor under the will or as attorney for the estate. The settlement agreement was not executed by any of the residuary legatees other than respondent.

2.  Respondent's father, a co-executor of the estate, died December 30, 1969, leaving respondent the sole surviving executor.

3.  Such negotiations would not properly fall within respondent's duties as either co-executor of the will or as attorney for the estate. If the executor does undertake to settle a claim challenging the validity of the will, he acts for the beneficiaries of the will, not as the executor of a challenged will. Moreover, he must seek compensation for these services from those for whom he is acting, not the estate. See *Faust Estate*, 364 Pa. 529, 531, 73 A.2d 369, 370 (1950).

Respondent requested the other residuary legatees to contribute to the settlement. The niece was asked to contribute $30,000 and each of the nephews were asked to contribute $10,000. The niece and one nephew complied with respondent's request, but the other nephew obtained counsel and, through him, refused. Respondent paid the balance of the settlement, $72,500, making up the share of the nephew who refused to contribute. Hunsicker withdrew his appeal from probate as a result of this private settlement.

A first and final account was filed by respondent on March 14, 1973. In it, respondent claimed $32,500 executor's commissions for his deceased father, $62,500 executor's commissions for himself, $22,000 attorney's fees for himself, and his one-quarter share of the residue, worth $239,000. The other residuary legatees filed exceptions to the account, claiming that they had not approved the settlement made with Walter Hunsicker and that the executor's and attorney's fees were exorbitant. Respondent agreed to settle these claims by paying the other three residuary legatees $80,000. The accounting, after the withdrawal of the exceptions filed by the other three residuary legatees, was not challenged in the orphans' court. Respondent had settled every challenge to the will and to his handling of the estate. He paid individually a total of $152,500 for withdrawal of the appeal from probate ($72,500) and for withdrawal of the exceptions to the account ($80,000).

The orphans' court, exceptions having been withdrawn, approved the first and final account, stated that "in confirming this account our action is not to be construed as expressing in any way shape or form approval or disapproval of the propriety of attorney Walker's actions in treating with Rosa Henninger during her lifetime or in administering and settling her estate," and referred the matter of respondent's conduct to the Disciplinary Board.

The Disciplinary Board conducted a preliminary investigation and charged respondent with improprieties during both the preparation and administration of the will. The charges were referred to a Hearing Committee. The Hearing Committee found that the charges of impropriety during the preparation of the will were not sustained by disciplinary counsel, but concluded that the charges of impropriety during the administration of the estate were well founded. It made the following findings and conclusions:

"It is inconceivable to us that Mr. Walker[,] once he became aware that a claim was being made on behalf of another heir, and once he [became] aware that the major problems in the case were the will itself and his interest therein, . . . did not then know that he would have to . . . become a witness. . . . His using other members of his firm to act as counsel is nothing but a sham and it certainly should not be condoned, nor can it be used as an excuse for his not withdrawing from the case completely. . . .

. . . . . . . .

"It is inconceivable to us that Mr. Walker failed to see that his personal interests were in conflict with the interests of the other heirs, and of the estate, as well as his interest as Executor of the estate. . . .

"Mr. Walker, on the date of the funeral of Miss Henninger, met with the other heirs and in effect advised them against the securing of other counsel because there would be great expense involved to them. . . . [It is apparent], at least to this Committee, that Mr. Walker . . . did not want to lose control of the matter if possible.

". . . We find it of great interest and certainly of considerable inferential value to note that the settlement of claims [against the accounting by the other residuary legatees] was made by Respondent out of his own funds."

The Disciplinary Board made substantially similar findings:

"The Respondent freely admitted that because of his particular situation he felt that he should pay more than the other three heirs in order to satisfy Walter Hunsicker. The Respondent does not seem to contest the fact that he wanted to get as much as possible from the other three heirs because that would reduce the amount that he himself would have to pay. It is at this point that the Board finds a conflict to exist between the role of Respondent as heir and the role of Respondent as co-executor and the role of Respondent as attorney for the estate. . . .

. . . . . . . .

". . . [I]t will be observed that Boyd Walker paid out $152,500.00 in an apparent effort to protect the amounts which he finally received totalling $356,000.00 including counsel fees and executor's commissions. The net result of these transactions was a benefit of $203,500.00 to Mr. Walker and his firm.

"It would appear that the Respondent accepted employment as attorney for the estate when he knew that his professional judgment might be affected by his own financial and personal interests by reason of his status as a beneficiary under the Will as well as his status as a co-executor thereof.

"It would seem that Respondent accepted employment as attorney when it appeared certain that he would be called as a witness with regard to the facts and circumstances relating to the execution of the Will.

"It is apparent that the Respondent represented [the other three residuary legatees] at the same time that he represented Henninger's estate since they occupied the status of heirs and were not represented by other counsel. . . . [The niece] testified that Respondent discouraged her from getting an attorney

and advised her that it would cost her $50,000 for his services . . ..

". . . Disciplinary Counsel has charged Respondent with violation of Canon 6 of the Canons of Professional Ethics . . .. This Canon deals with 'adverse influences and conflicting interests.' . . . This Canon requires [that] . . . the possibly adverse effects of the conflict of interest be fully explained by the attorney to the client who is affected and especially that the client thoroughly understand the conflicts. The Board is not satisfied that the full disclosure was made. The Board is also of the opinion that the conflict was irreconcilable since not only was there a conflict between and among clients but there was the conflict between Respondent himself and all and each of his clients. . . .

. . . . . . . .

". . . [A]t the very outset, Respondent knew that he was the one legatee that had an interest in upholding the validity of the 1968 Will and that the three other residuary legatees would receive a greater share in the estate under the provisions of an earlier Will. The conflict of interest present under the facts was fundamental and obvious and irreconcilable and could easily have been avoided by Respondent as co-executor not naming himself as attorney for the estate."

We have examined the record and find substantial support for the conclusion [4] that respondent has violated Canon 6 of the Code of Professional Ethics.[5]

---

4. The standard of review in cases such as this is de novo. We are not bound by the findings of either the Hearing Committee or the Disciplinary Board. *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 479, 345 A.2d 616, 620 (1975). However, we are guided by the decisions of these triers of fact to credit certain testimony and to discount other testimony.

5. We finding a violation of the Code of Professional Ethics and not the Code of Professional Responsibility because the Code of Professional Responsibility was not adopted and made effective by this Court until February 27, 1974.

■■ Respondent contends that the orphans' court confirmation of the first and final account settles, in his favor, any issues regarding the propriety of his conduct while administering the estate. We reject this claim for several reasons. First, the orphans' court explicitly stated that it was not approving or disapproving respondent's conduct and indicated that it felt his conduct deserved further investigation by the Disciplinary Board. Second, the orphans' court has no power to pass upon the propriety of an attorney's professional conduct. The power to investigate an attorney's conduct and to impose discipline is, with few exceptions,[6] possessed solely by this Court and its official disciplinary organization. Third, none of the issues regarding respondent's conduct were ever brought before the orphans' court. Respondent paid out more than $150,000 to assure that the orphans' court was not given an opportunity to examine his conduct while preparing the will or administering the estate. Finally, even if the issue had been directly presented to the orphans' court, this Court would not be barred from acting. Supreme Court Rule 17–11 explicitly provides that a verdict of acquittal in favor of the attorney charged with professional misconduct in either a criminal or a civil suit involving the same conduct as the disciplinary proceeding shall not bar the disciplinary proceeding.

■■ Finally, respondent contends that the Disciplinary Board was without authority to increase the severity of the sanction recommended by the Hearing Committee. We disagree. A Hearing Committee imposes no discipline. It takes evidence and submits a report and recommendation to the Disciplinary Board in every case. The Disciplinary Board may then dismiss the charges, or, if it sustains them, may either impose a private reprimand or recommend to this Court a more severe sanction. If the latter course is chosen, discipline is imposed

6. The exceptions are contained in Pa.Sup.Ct.R. 17–1.

by this Court; all prior proceedings result in nonbinding recommendations. It is clear that the Disciplinary Board is free, within the limits of Supreme Court Rule 17–4, to recommend whatever discipline it deems appropriate. It is also clear that this Court may impose whatever sanction it deems appropriate. See Supreme Court Rule 17–8(c).[7]

In this case, the Hearing Committee recommended a private censure. The Disciplinary Board recommended a public censure. We impose a one year suspension from the practice of law. In addition to this disciplinary sanction under our rules, we direct that all executor's fees and attorney's fees collected by respondent be refunded to the estate and distributed in conformity with the terms of the will.[8] We impose this obligation

---

7. The discipline which may be imposed for professional misconduct pursuant to our rules of disciplinary enforcement is limited to (1) disbarment, (2) suspension not exceeding five years, (3) public censure, (4) private reprimand, or (5) private informal admonition. See Rule 17–4. The first three types of discipline are imposed by this Court, the fourth by the Disciplinary Board, and the fifth by Disciplinary Counsel. While the Disciplinary Board is limited in its recommendation to this Court to the first three types of discipline listed in Rule 17–4, this Court is not so circumscribed in the action which it may appropriately take. Forty years ago Chief Justice Kephart summarized the powers of the Court relative to discipline as follows:

"It is the right and duty of a court to discipline its members who appear before it guilty of wrongdoing. *In re Davies,* 93 Pa. 116; *Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732. Courts have an inherent power to make and follow rules governing such matters or to formulate new rules as the case demands so long as no right of the member charged is invaded. But the rules thus established do not restrict the general power of the courts; the power which establishes such rules in the first instance also enables the courts to disregard such rules and adopt the methods most suitable to the occasion."

*In re Disbarment Proceedings,* 321 Pa. 81, 101, 184 A. 59, 68 (1936). See also *McLaughlin v. Philadelphia Newspapers, Inc.,* 465 Pa. 104, 348 A.2d 376, 380 (1975); *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616, 679 (1975); *In re Shigon,* 462 Pa. 1, 13, 329 A.2d 235, 241 (1974). See also Preamble to the Rules of Disciplinary Enforcement, 446 Pa. xxiv, 286 A.2d (Pa.Rptr.) LXXV.

8. The total amount is $84,500—$22,000 in attorney's fees and $62,500 in executor's commissions. This restitution is ordered

because the conduct in this case displays a gross abuse of respondent's position and knowledge of the law in his dealings with the other residuary beneficiaries. First, respondent discouraged the other residuary legatees from consulting other counsel by suggesting that such other counsel might cost them as much as $50,000. Attorney's fees are not advertised. They are a matter within the special knowledge of members of the legal profession. Respondent's estimate was probably regarded by these laymen as accurate and reasonable. Second, respondent failed to explain fully the conflict of interest between his roles in the administration of the estate,[9] his role as beneficiary, and their roles as beneficiaries under the will. Third, it is apparent that respondent never explained to the other residuary beneficiaries that the estate had to hire an attorney and that they would best be served by an independent attorney for the estate. Fourth, it is apparent that respondent never explained why he was urging settlement of Hunsicker's claim for the rather large amount of $112,500. In order to succeed, Hunsicker would have had to strike down the August 13, 1968, and the July 15, 1966, wills while leaving the June 1, 1966, will intact. Moreover, it is apparent that respondent, who was neither a legatee nor an executor under the June 1, 1966 will, was the only residuary beneficiary who

pursuant to the inherent powers of this Court to control and regulate the conduct of members of its bar. See footnote 7, supra.

9. As an attorney, respondent should have been aware of the strict standards of conduct to which a fiduciary is expected to adhere.
"A [fiduciary] is held to something stricter than the morals of the market place. Not honestly alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this, there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."
*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928), quoted with approval in *Girt Estate*, 452 Pa. 156, 165, 305 A.2d 372, 377 (1973).

would have lost anything if Hunsicker's claim had prevailed. In short, it is apparent that respondent failed properly to represent the estate for which he was the attorney, failed to deal fairly with the other residuary beneficiaries whom he advised not to get independent counsel, and failed to conform to the ethics of his profession. Instead, respondent took advantage of his legal knowledge, his position as an attorney, and the respect and trust with which the other residuary legatees regarded him to further his private financial interests. We condemn this conduct most thoroughly.

We therefore order that respondent be suspended from the practice of law for a period of one year in conformity with Pa.Sup.Ct.R. 17–17 and further order that he return all attorney's fees, in the amount of $22,000, and all executor's fees, in the amount of $62,500, to the estate to be distributed under the terms of Henninger's will.