**In re Anonymous No. 17 D.B. 86**

Disciplinary Board Docket No. 17 D.B. 86.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania,

FRIEDMAN, *Member,* August 21, 1991—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania, herewith submits its findings and recommendations to your honorable court

with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

Respondent, [ ], was admitted to practice law in the Commonwealth of Pennsylvania on June 2, 1982. His current address is [ ].

On February 7, 1986, in the U.S. District Court, [ ] District of New York, respondent was convicted of two counts of bank fraud in violation of 18 U.S.C. §1344 and conspiracy in violation of 18 U.S.C. §371. On April 14, 1986, the respondent was sentenced by the Honorable [A], chief judge, to two consecutive terms of incarceration of one year and one day and ordered to pay restitution in the amount of $143,500.

Two days prior to his sentencing, on April 2, 1986, respondent submitted to the Supreme Court of Pennsylvania a statement of resignation from the practice of law. In his resignation, respondent did not admit the underlying misconduct, but only admitted to his criminal conviction. By order of the Supreme Court of Pennsylvania dated April 14, 1986, respondent was disbarred on consent.

In an order and opinion filed November 17, 1986, the U.S. Court of Appeals for the [ ] Circuit reversed respondent's conviction and remanded the matter for a new trial. On or about January 9, 1987, the U.S. attorney for the [ ] District of New York and respondent, through counsel, entered into an agreement whereby the government agreed to nolle prosequi all charges and respondent agreed to waive all rights to recover the restitution paid or to take action against the gov-

ernment for his incarceration. On January 20, 1987, respondent filed a petition to withdraw resignation with the prothonotary of the Supreme Court. By order dated March 6, 1987, the Supreme Court denied respondent's petition to withdraw resignation. On March 16, 1987, respondent filed with the prothonotary of the Supreme Court a petition for reconsideration. Oral argument was held before the Supreme Court on November 10, 1987. By order dated December 9, 1987, the Supreme Court referred the matter to the Disciplinary Board to determine whether respondent was uninformed as to the unconditional effect of his verified statement of resignation. Pursuant to this order, a hearing was held before a three-member panel of the board on April 14, 1988. On July 14, 1988, the Disciplinary Board forwarded its report and recommendation to the Supreme Court. The board determined that respondent was not aware of the unconditional consequence of his resignation and recommended that respondent be reinstated to the bar of the Supreme Court of Pennsylvania, pending the final resolution of the charges which formed the basis for his criminal conviction. By order dated October 14, 1988, the Supreme Court remanded the matter to the Disciplinary Board for prompt disposition of the underlying charges of misconduct, including bank fraud and conspiracy.

By letter dated October 17, 1988, Nan M. Cohen, secretary of the Disciplinary Board, notified petitioner to file a petition for discipline. Petitioner and respondent, through counsel, stipulated that "any petition for discipline resulting from the investigation of the underlying charges may be submitted by petitioner to the Office of the Secretary directly, without proceeding

through the provisions of Rule 208(a)(3), Pa.R.D.E." Office of Disciplinary Counsel filed a petition for discipline against respondent on November 22, 1988.

On March 8, 1989, the matter was referred to Hearing Committee [ ] consisting of [ ]. A hearing was held on February 13, 1990. On August 23, 1990, the Hearing Committee filed its report recommending respondent be suspended from the practice of law for a period of five years retroactive to April 2, 1986, the date on which respondent submitted his resignation. On September 12, 1990, Office of Disciplinary Counsel filed a brief on exceptions to the report and recommendation of the Hearing Committee. Petitioner argues that the findings of fact made by the Hearing Committee support a recommendation of disbarment.

In the interim, on September 6, 1990, respondent filed a petition with the Supreme Court, requesting the court to confirm his disbarment by consent pursuant to his resignation and to withdraw his petition to withdraw his resignation. On September 11, 1990, Office of Disciplinary Counsel filed with the Supreme Court its answer to respondent's petition.

The matter was adjudicated by the Disciplinary Board at its scheduled meeting on November 2, 1990.

## FINDINGS OF FACT

On February 26, 1985, [B], an employee of [C] Oil Corp. ([C]), stole three checks payable to [C] in the aggregate amount of $128,533. [B] deposited the checks into [C's] account at [D] Bank without recording the deposit on the company's books. [B] then stole a sheet of blank checks from the back of [C's] check-

book. On checks numbered 2771 and 2773, [B] filled in the amounts of $71,500 and $72,000 and on both checks traced the signature of [E] who, along with [B's] nephew [F], owned [C]. On each check, [B] noted that the money was for "return of loan and interest."

In seeking to cash the checks, [B] contacted [G], a business associate who worked as a financial adviser. [G], in turn, contacted [H] who then contacted respondent.

Prior to this transaction, respondent, [G] and Ms. [H] knew each other and had similar business backgrounds. Respondent is an attorney licensed to practice law in Pennsylvania. Although he is not licensed to practice in New York, respondent was associated with the law firm of [I] from 1980 to 1984 where he worked on real estate and entertainment law matters. During the time period of 1984 to 1985, respondent's activities involved real estate, corporate finance work and the promotion of entertainment/concert events. Prior to February of 1985, respondent knew [H] for years. Respondent had worked on numerous mortgage brokerage projects with [H], who is a "venture capitalist." In approximately 1984, [H] had introduced respondent to [G] in regard to a mortgage financing project.

On February 25, 1985, [H] telephoned respondent and explained that a client of [G] sought to cash two checks which the "client" ([B]) was receiving in repayment of a loan. The money was to be used to acquire a restaurant. At this time, [H] asked respondent to serve as an escrow agent, explaining that she and [G] had been working on the transaction and were to

receive a fee of 10 percent. Respondent informed [H] that he would require a written escrow agreement.

On the same day, February 25, 1985, respondent began to make arrangements to clear the two checks through his special attorney escrow account at the [J] branch of [D] Bank. Respondent met with [K], manager of the [J] branch, and told her that "he was doing the [L] concert" and that he was about to receive a large check drawn on another branch of [D] Bank. Respondent also asked Ms. [K] how quickly he could obtain the cash after depositing the check. At the disciplinary hearing, respondent admitted that he emphasized the [L] concert to impress Ms. [K] and to motivate the bank officials to allow a cash delivery.

On the following day, February 26, 1985, [H] telephoned respondent and informed him that an escrow agreement had been prepared and the checks were ready to be cashed. On the same day, [G] also telephoned respondent to confirm the transaction. During this telephone conversation, [B] got on the line and informed respondent about the restaurant deal. He also told respondent that he had signed the escrow agreement and that he wanted the funds in cash. Prior to this telephone conversation, respondent had never spoken with [B].

On the evening of February 26, 1985, Ms. [H] met with respondent at a restaurant called [ ] Place. During their meeting, Ms. [H] handed to respondent the two checks stolen by [B] and drawn on the [C] account at [D] Bank. On each check the name of the payee had been left blank. Respondent wrote in the payee section of the check: "[Respondent], as escrow agent." [H] also gave to respondent the handwritten escrow agreement which provided the following:

"Dear [Respondent]:

"You are hereby authorized to deposit these checks as follows:

"(1) No. 2771 dated February 17, 1985, drawn by [C] Oil Co. on [D] Bank for $71,500 and

"(2) No. 2773 same for $72,000 in your escrow account. At clearing the cash will be delivered to the undersigned minus a 10 percent service charge.

/s/ "[B]"

On the morning of February 27, 1985, respondent telephoned Ms. [K], the branch manager, and informed her that he was bringing the two checks to the bank for deposit. That afternoon, respondent arrived at the bank and spoke with Ms. [M], Ms. [K's] administrative assistant. After Ms. [M] confirmed that the funds were available, respondent deposited the checks into his special attorney escrow account. Later that afternoon of February 27, 1985, respondent telephoned Ms. [K] and asked when was the earliest time he could withdraw the proceeds of the checks, preferably in large bills. Ms. [K] informed respondent that the earliest she could provide the cash would be Friday, March 1, 1985. During the conversation, Ms. [K] questioned respondent about the large amount of cash. Respondent replied that it was not unusual in the entertainment promotion business to carry large amounts of cash and suggested that she verify this fact with the former branch manager, [N]. Subsequently, Ms. [K] spoke with Mr. [N] who stated that he saw nothing unusual about the transaction. Mr. [N] then telephoned respondent, who in response to Mr. [N's] question concerning the use of the cash answered, that "they were buying into the [L] concert."

On the morning of February 28, 1985, respondent telephoned Ms. [K] and said that he could not wait until Friday, March 1; he needed the money that day. After contacting the [O] branch of the [D] Bank to verify that the checks' maker had not reported any lost or stolen checks and that the central check file department had no problem with the signatures, Ms. [K] arranged to distribute the cash that day. Ms. [K] telephoned respondent and advised him he could pick up the cash at 3 p.m. Prior to respondent's arrival at the [J] branch of the [D] Bank, Ms. [H] and Mr. [G] arrived. During a conversation with Ms. [K], [G] told her that he had given up an official position at a financial institution to become an agent and that he had connections in the entertainment world. When respondent arrived, he filled out a counter check supplied by Ms. [K]. Respondent made the check out to himself in the amount of $143,500. In the memorandum section of the check respondent wrote "[L] concert." After receiving the cash, respondent removed the 10 percent "fee" for cashing the checks which amounted to $14,350. Respondent, Ms. [H] and Mr. [G] each took a one-third share of the "fee" before leaving the bank. Thereafter, respondent, Ms. [H] and Mr. [G] met Mr. [B] at the [ ] bar in [J]. At that time, respondent gave Mr. [B] the monies for which [B] signed a receipt.

On March 5, 1985, Ms. [K] learned that the checks respondent deposited into his account had been forged. Ms. [K] telephoned respondent, advised him of the problem and demanded the return of the money. On March 6, 1985, respondent met with officials from the [D] Bank and bank counsel. During this meeting, respondent admitted that he had misrepresented the pur-

pose to which the money was used. Specifically, respondent admitted to the bank officials that he lied about his involvement with the [L] concert.

Thereafter, the Federal Bureau of Investigation received a report of the forged checks and began an investigation. During the course of this investigation, [P], special agent, FBI, interviewed respondent. During the conversation, respondent told Special Agent [P] that he had received and cashed two checks in the amount of $143,500, filled in the payee, and received a fee for doing so. Respondent informed Special Agent [P] that he had stated that he intended to use the entire amount to invest in the [L] concert. Respondent contended "that that statement was somewhat correct in that he used the $4,000 to invest in the [L] concert."

During his direct testimony in his criminal trial, respondent admitted that he told Ms. [K] that he was going to make a "substantial investment in the [L] concert scheduled for [ ] in the middle of March." Furthermore, he admitted that he "told her it was a late buy-in, and that's why (he) required cash."

Respondent placed his portion of the cash fee for negotiating the checks in his "business escrow account for business dealings." During cross-examination at his criminal trial, respondent adamantly insisted that he had invested in the [L] concert and that there were documents to support that fact. During cross-examination, respondent contended, inter alia, that there were records evidencing his investment in the [L] concert, but that he did not supply them because they were "at the offices of [ ] ... the primary promoters of the [L] concert" and he had "no access to their files."

Respondent never invested in the [L] concert. Respondent's testimony at his criminal trial concerning investing in the [L] concert was false.

## CONCLUSIONS OF LAW

Respondent's conduct constitutes a violation of the following Disciplinary Rules of the Code of Professional Responsibility:

(a) D.R. 1-102(A)(3)—which states that a lawyer shall not engage in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(4)—which states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation; and

(c) D.R. 1-102(A)(6)—which states that a lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.

Respondent's conduct did not constitute a violation of D.R. 3-101(B)—which states that a lawyer shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction.

## DISCUSSION

This case arises from respondent's involvement in a conspiracy to negotiate two checks stolen from the [C] Oil Corp. in the amount of $143,500. Respondent cleared the two checks through his special attorney escrow account for which he received a $4,400 fee. In order to facilitate the cashing of the checks, respondent consistently misrepresented to the bank officials the purpose for which the money was intended

to be used. After thoroughly considering the evidence, the Hearing Committee determined that respondent's misconduct did not warrant disbarment and recommended respondent be suspended from the practice of law for a period of five years. In support of its determination that disbarment was inappropriate discipline in this matter, the Hearing Committee pointed to the fact that respondent's conviction was reversed by the U.S. Court of Appeals for the [ ] Circuit. The committee also argued that respondent had already "paid a heavy penalty for his acts" by serving a nine-month prison sentence and making restitution for the entire $143,500.

Although the board is guided by the Hearing Committee's findings with respect to matters of credibility, the board conducts its review of attorney disciplinary cases de novo and may recommend to the Pennsylvania Supreme Court whatever discipline it deems appropriate. See *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 275, 472 A.2d 186, 188 (1983); *Office of Disciplinary Counsel v. Walker,* 469 Pa. 432, 366 A.2d 563, 568 (1976)

The board disagrees with the Hearing Committee's reasoning in rejecting disbarment as the appropriate form of discipline. The board recognizes that respondent served nine months in prison and made restitution in the amount of $143,500. However, these factors do not negate the egregious nature of respondent's misconduct. As stated by the Supreme Court of Pennsylvania, payment of restitution will not settle or destroy the public's right to protection against an attorney guilty of acts unworthy to his profession. See *In re Leopold,* 469 Pa. 384, 366 A.2d 227, 233 (1976). Despite the

fact that the U.S. Court of Appeals reversed respondent's conviction and remanded for a new trial, respondent is still subject to disciplinary proceedings based on the underlying conduct. See *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616 (1975). Acquittal of a crime will not bar discipline of an attorney based upon the same acts or conduct involved. *Id.* at 621, citing *In re Echeles*, 430 F.2d 347, 352 (7th Cir. 1970). Disciplinary proceedings are not equivalent to criminal proceedings. Unlike criminal proceedings, the nature of disciplinary sanctions are not primarily punitive, but designed to protect the public from attorneys who are unworthy of the public's trust. *Office of Disciplinary Counsel v. Tinari*, 499 Pa. 284, 288, 453 A.2d 310, 312 (1982). As directed by the Supreme Court of Pennsylvania in *Office of Disciplinary Counsel v. Casety*, 511 Pa. 177, 512 A.2d 607, 609 (1986), the board's duty is to examine the nature and extent of the underlying conduct and to focus its inquiry on whether respondent's conduct makes him unfit to practice law from the standpoint of protecting the public.

Respondent played an active and essential part in an illegal conspiracy to negotiate stolen checks. [B], an employee of [C] Oil Corp., stole a sheet of checks from his employer. [B] filled in two checks in the amounts of $71,500 and $72,000. On both checks, [B] traced the signature of the owner, [E], and noted that the money was for the "return of loan and interest." Needing to cash the checks, [B] contacted [G], who in turn contacted [H]. [H] contacted respondent, who proved to be the key to implementing their scheme. Respondent had an attorney escrow account at the same bank [C] had its account.

Ms. [H] telephoned respondent and explained that a client of Mr. [G], named [B], needed to cash two checks which he was receiving in repayment of a loan. The following evening, Ms. [H] met with respondent and expressed an urgent need to get the cash because there was a closing on the restaurant [B] was involved in acquiring. During this meeting, Ms. [H] handed respondent the two checks and a handwritten escrow agreement purportedly signed by [B]. Respondent accepted the checks despite the fact the payee sections were left blank. Respondent agreed to run the checks through his escrow account, despite the suspicious circumstances and the fact that he knew Ms. [H] had a prior criminal record. Respondent also knew that he, Ms. [H] and Mr. [G] were being paid $14,000 simply for cashing the checks.

In light of the circumstances surrounding this transaction, respondent as a lawyer and an experienced businessman knew or should have known that the purpose of the transaction was tainted with impropriety, as well as illegality. Respondent was under a duty to proceed with caution and exercise his independent judgment. However, he failed to do so. Respondent, an experienced businessman, never took any steps to verify the legitimacy of this transaction. Specifically, respondent failed to question the urgent need for cash, failed to ask why a cashier's check would not be sufficient, failed to examine the check, and failed to check out [B] or the existence of the supposed restaurant. The board disagrees with the Hearing Committee's determination that respondent's actions and failure to use common business sense could be attributed to impetuousness and immature judgment. The board believes

that respondent's conduct demonstrates a clear intent to defraud the bank and "cash in on the deal."

In addition to participating in the conspiracy, respondent engaged in a series of misrepresentations. In order to facilitate the cashing of the checks, respondent consistently misrepresented to the bank officials that he was going to make a "substantial investment in the [L] concert" and he required cash. At no time during his conversation with any bank personnel, did respondent mention his involvement with [H], [G] or [B]. Respondent never mentioned the restaurant. Respondent perpetuated his lie about the [L] concert after it was discovered that the checks were stolen and forged. During his conversation with Federal Bureau of Investigation Special Agent [P], respondent stated that he invested $4,000 in the [L] concert. During cross-examination at his criminal trial, respondent adamantly insisted that he had invested in the [L] concert and there were documents to support this statement. Respondent never produced these supposed documents and in fact, never invested in the [L] concert.

Respondent also lacked candor before the Hearing Committee. During the hearing, respondent testified that the check cashing transaction he was involved in did not strike him as odd under the circumstances due to the fact he "had seen it done before." Respondent further testified: "It wasn't like I was chartering into new waters. [sic] You are only as good as your training." However, at his criminal trial, respondent testified that he never accepted a fee in exchange for cashing a check in the manner in which he did on behalf of Mr. [B]. This inconsistency in respondent's testimony demonstrates his lack of candor and negligent disregard

for the truth. As stated by the Supreme Court in *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981):

"Truth is the cornerstone of the judicial system: a license to practice law requires allegiance and fidelity to truth. False swearing and dishonest conduct are the antithesis of these requirements. We deem disbarment to be the appropriate remedy for false swearing." *Id.* at 733.

The board is also concerned by respondent's failure to admit any wrongdoing. During the hearing, respondent argued that the bank was liable for the cashing of the forged checks and not himself. Respondent's testimony as follows, demonstrates his lack of responsibility for his own misconduct:

"They had an obligation to their customer. So, what they basically did was they hung me out—I mean, I don't—they didn't hang me out to dry. They—look, they were liable. They checked the signature, they did their due diligence. They wouldn't have cashed the check if the signature wasn't genuine and there weren't funds in the bank. They would have cashed the check under any circumstances. I could have told them I was investing in, I don't know, pick something, and they would have cashed the check. It made no difference."

Respondent engaged in a scheme to deceive the public. Such deception is just as odious and reprehensible as the deception of a client. *In re Anonymous* 41 and 42 D.B. 79, 21 D.&C.3d 294, 299 (1981). The board finds that respondent's conduct was motivated by sheer personal gain. Respondent's conduct is a discredit to

the legal profession. Imposition of a suspension even for a period of five years, as recommended by the Hearing Committee, is inadequate to protect the public.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent be disbarred from the practice of law in the Commonwealth of Pennsylvania effective April 14, 1986, the date on which he was disbarred on consent. The board recommends further that respondent be ordered to pay costs of investigating and prosecuting this matter.

Messrs. Tumolo and Gilardi did not participate in the adjudication.

## ORDER

And now, August 21, 1991, upon consideration of the report and recommendations of the Disciplinary Board dated January 18, 1991, it is hereby ordered that [respondent] be and he is disbarred from the bar of this Commonwealth effective April 14, 1986, the date on which he was disbarred on consent and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.