## In re Anonymous No. 124 D.B. 97

Disciplinary Board Docket no. 124 D.B. 97.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

STEWART, *Member,* November 23, 1998—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

Office of Disciplinary Counsel, petitioner, filed a petition for discipline against respondent, [   ], on October 14, 1997. The petition alleged that respondent improperly used funds arising out of a client's personal injury settlement, and further, failed to timely pay a referral fee to another attorney. Respondent was charged with violation of Rules of Professional Conduct 1.15(a), 1.15(b), 1.15(c), and 8.4(c). Respondent filed an answer to petition on November 12, 1997.

A disciplinary hearing was held on February 6, 1998 before Hearing Committee [   ], comprised of Chair, [   ], Esquire, and Members [   ], Esquire, and [   ], Esquire. Respondent was represented by [   ], Esquire. Petitioner was represented by [   ] Esquire.

The committee filed a report on May 26, 1998 and recommended a one-year period of suspension. Respondent filed a brief on exceptions and request for oral ar-

gument on June 3, 1998. Respondent requested that the board reject the committee's recommendation and recommend to the Supreme Court either a public censure, with or without probation, or a stayed suspension with probation. Petitioner filed a brief on exceptions on June 4, 1998 and a brief opposing respondent's exceptions on June 12, 1998, and requested that the board recommend a sanction in the range of a three-year suspension to a disbarment.

Oral argument was held on July 21, 1998 before a three-member panel of the Disciplinary Board chaired by Richard W. Stewart, Esquire, and consisting of Members Thomas J. Elliott, Esquire, and Mark C. Schultz, Esquire.

This matter was adjudicated by the Disciplinary Board at the meeting of August 13, 1998.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1947 and admitted to practice law in Pennsylvania on May 24, 1983. His registered address for the practice of law is [   ]. Respondent is subject to the jurisdiction of the Disciplinary Board of

the Supreme Court of Pennsylvania. Respondent is married and has one minor child.

(3) In and subsequent to 1992, respondent represented [A] relative to personal injuries she received in an accident that occurred on July 17, 1992. Respondent's fee agreement with [A] was for him to receive a contingency fee of one-third of the gross amounts paid to her as a result of the representation.

(4) Respondent's representation of [A] was as a result of a referral from [B], Esquire, [A's] family attorney. Respondent's normal referral fee agreement with Attorney [B] on contingency matters was to remit to him 50 percent of the fees as those fees were received by respondent.

(5) At all times pertinent hereto, respondent maintained as a part of his law practice an escrow account and an office account at [C] Bank. Respondent utilized the Safeguard double-write ledger systems in his law practice.

(6) On April 1, 1993, [D] Insurance issued a draft for $33,334, payable to respondent and [A] in satisfaction of a portion of her claims arising from the accident. Respondent deposited this check into the escrow account, as reflected in the summary for the account and the Safeguard ledgers. (P.E. 1 & 15.)

(7) On April 7, 1993, respondent had a settlement with [A] relative to the $33,334. Respondent distributed $11,111.11 to himself as the total one-third contingency fee due by transferring that amount from the escrow account to the office account. Respondent also distributed $160.12 to himself in reimbursement of costs he had advanced. These transactions were noted on the Safeguard ledgers. (P.E. 1 & 17.)

(8) The April 7, 1993 settlement sheet reflects the balance due to the client as $22,062.11 and the notation that "$5,000 of the balance due client will be distributed to client at settlement. The balance, $17,062.11, will remain in [respondent's] escrow account until the Medicare lien in this case is satisfied, compromised, or waived." (P.E. 1 & 19.)

(9) On April 7, 1993, one-half ($5,555.56) of the $11,111.11 received in fees was potentially subject to the referral fee interests of Attorney [B]. On this date, respondent wrote a check on his office account for $5,555.56 to Attorney [B], but then voided the check.

(10) Subsequent to respondent's receipt of the fees of $11,111.11, respondent personally utilized, without the knowledge or permission of Attorney [B], the $5,555.56 portion that was potentially subject to the referral fee due to Attorney [B].

(11) On April 14, 1993, [E] Insurance issued a draft for $100,000 payable to respondent and [A], in satisfaction of the balance of her claim arising from the accident. Respondent deposited this check in his escrow account.

(12) On April 15, 1993, respondent had a settlement with [A] and transferred $33,333.33 to the office account as the one-third contingency fee.

(13) On April 15, 1993, [A] executed the settlement sheet prepared by respondent relative to the $100,000 portion of the settlement. The sheet reflects the balance due the client as $66,666.67 and reflects the notation "This balance due client will remain in [respondent's] escrow account until the Medicare lien in this case is satisfied, compromised, or waived. Any balance due cli-

ent after these disbursements are made will be issued to client." (P.R. 1 & 26.)

(14) Of the $33,333.33 fee respondent received on April 15, 1993, one-half ($16,666.67) was potentially subject to the referral fee interests of Attorney [B].

(15) Subsequent to April 15, 1993, respondent personally utilized the $16,666.67, which sum was potentially subject to the interests of Attorney [B].

(16) In April 1993, respondent spoke to Attorney [B] and acknowledged the settlement totaling $133,333.33 and told Attorney [B] the determination and payment of any referral fee would have to wait until the determination of the subrogation amount due on the settlement.

(17) As of April 15, 1993, the subrogation amount was undetermined.

(18) Respondent never made any written attempts to have the Medicare lien satisfied, compromised or waived, although he or his staff had some verbal discussion with Medicare representatives. On one or more occasions, respondent's office sent to [A] forms to complete and return for submission to Medicare, but these forms were not returned to respondent.

(19) As of April 15, 1993, from the $133,333.33 in total settlement proceeds respondent had obtained and received for [A], respondent had distributed to himself all of the attorney fees and costs due on the total settlement.

(20) On May 14, 1993, respondent took $6,000 from the escrow account and recorded this amount as taken from the funds maintained for [A].

(21) The check for $6,000 contained the notation "[A] Medicare retainer."

(22) No retainer agreement existed between respondent and [A] relative to either the Medicare subrogation claim or to the $6,000 respondent took from the escrow account.

(23) Respondent used these funds for his own benefit.

(24) On June 15, 1993, respondent took $1,000 from the escrow account and used the sum for his own benefit.

(25) By letter of July 23, 1993, [F], on behalf of Medicare, notified respondent that the subrogation claim totaled $24,186.20.

(26) As of July 23, 1993, the maximum due Medicare was the subrogation of $24,186.20 less the pro rata share of legal fees and costs Medicare was legally required to pay. Medicare's one-third pro rata share of the legal fee was one-third of the total subrogation of $24,186.20, which is $8,062.07, and which amount the respondent had received as part of the total fees respondent had taken in April 1992. Medicare's one-third pro rata share of the $160.12 in costs the respondent incurred in obtaining the initial settlement proceeds was $53.37.

(27) The total due Medicare was the total subrogation of $24,186.20, less the pro rata attorney fee of $8,062.07, less the pro rata costs of $53.37, for a net due of $16,070.76.

(28) On July 28, 1993, respondent took and personally used $1,200 from [A's] funds.

(29) On August 6, 1993, respondent took $4,200 from [A's] funds.

(30) As of August 6, 1993, respondent had taken and converted to his own use $12,400 of the funds in his possession payable to [A].

(31) Respondent testified that he believed he was entitled to take the $12,400 as a second fee on the subrogation amount, even though he had already taken a one-third fee on the entire settlement. (N.T. 98-99.)

(32) In the summer or fall of 1993, respondent acknowledged to his office staff that he knew it was wrong to have taken the $12,400 in proceeds. Respondent informed his staff that he intended to make restitution of the $12,400 as soon as he could.

(33) As of October 6, 1993, respondent had distributed a total of $15,000 to [A].

(34) On December 2, 1993, [A] died testate in [   ] County. Shortly thereafter, Attorney [B], on behalf of the [A] estate, made a demand of respondent for an accounting and payment to the estate of the [A] funds respondent possessed.

(35) In February 1994, Attorney [B] frequently contacted respondent and demanded both the payment of the funds due and an accounting. Attorney [B] needed the funds to take advantage of the discount of Pennsylvania transfer inheritance tax paid within three months of death.

(36) In late February 1994, respondent gave Attorney [B] an accounting of the [A] settlement proceeds and a check in the amount of $49,542.58.

(37) By letter dated March 7, 1994, respondent transmitted to Attorney [B] a check in the amount of $24,186.20. Respondent gave the [A] estate the gross amount originally retained for the Medicare subrogation.

(38) Of this total amount of $24,186.20, at least $12,400 represents the funds respondent converted, and

at least part of the check represents personal funds respondent commingled in the escrow account.

(39) The March 7, 1994 payment was the balance of the funds that respondent owed to the estate from the settlement proceeds totaling $133,333.33.

(40) By check dated July 7, 1994 in the amount of $17,000 made payable to [B], Attorney [B] accepted payment in satisfaction of part of the referral fees due to him.

(41) By letter of July 1, 1994, Attorney [B] attempted to have the Medicare subrogation against the [A] settlement funds compromised or waived. By letter of September 24, 1994, Medicare acknowledged the obligation to pay a pro rata share of attorney fees and costs incurred in producing the settlement, but denied the request for any waiver. It asserted the amount due was $16,095.09. This amount was paid to Medicare by the [A] estate.

(42) After petitioner became aware in 1994 of respondent's handling of the [A] settlement proceeds, petitioner undertook an extensive investigation of respondent's financial records. Respondent cooperated fully with this investigation.

(43) Respondent has no prior record of discipline.

(44) Respondent expressed sincere remorse for his misconduct and recognizes the errors he made in his handling of the [A] settlement. (N.T. 96, 103.)

(45) Seven character witnesses testified on respondent's behalf at the disciplinary hearing. These witnesses were fellow attorneys and community members, and they testified to respondent's good reputation for truthfulness and honesty. (N.T. 21-71.)

## III. CONCLUSIONS OF LAW

Respondent's conduct, as set forth above, constitutes violations of the following Rules of Professional Conduct:

(1) R.P.C. 1.15(a)—Failing to hold property of clients or third persons that is in the attorney's possession in connection with a representation separate from the attorney's own property.

(2) R.P.C. 1.15(b)—Failing to promptly deliver to a client or third person any funds or other property that a client or a third person is entitled to receive and, failing to promptly render a full accounting regarding such property, upon request by a client or third person.

(3) R.P.C. 1.15(c)—Failing to hold property of clients or third persons claiming interest separate until there is an accounting and severance of their interests.

(4) R.P.C. 8.4(c)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

This matter comes before the Disciplinary Board on a petition for discipline filed against respondent on October 14, 1997. The petition alleged that respondent engaged in misconduct relative to a client's settlement proceeds. Respondent was charged with violation of Rules of Professional Conduct 1.15(a), (b), and (c), and 8.4(c).

The Disciplinary Board conducts a de novo review of all disciplinary matters that come before it upon recommendation by a Hearing Committee. *Office of Disciplinary Counsel v. Duffield,* 537 Pa. 485, 644 A.2d 1186 (1994). The board is not bound by the findings and rec-

ommendation of the Hearing Committee, but rather is free to make its own recommendation based on the formulation of its own findings and conclusions. *Office of Disciplinary Counsel v. Walker,* 469 Pa. 432, 366 A.2d 563 (1976).

A stipulation of facts was reached by the parties and respondent agreed that his actions constituted a violation of at least Rule 1.15(a). A hearing was held during which petitioner presented as its case in chief the stipulation and 26 exhibits to which the stipulation referred. Respondent testified on his own behalf and presented seven character witnesses.

The facts of this case may be summarized as follows. Respondent received a settlement of $133,333 for his client, [A]. This settlement was subject to a one-third contingency fee of $44,444. Respondent converted to his own uses, through a series of checks drawn on his escrow account, an additional total sum of $12,400 from the [A] settlement proceeds. Respondent believed he was entitled to this sum as his fee for the subrogation amount, even though he had already taken a one-third fee on the entire settlement. Respondent eventually made restitution to the [A] estate. A partial referral fee of $17,000 was paid to Attorney [B].

Office of Disciplinary Counsel has the burden to prove by a preponderance of the evidence "an attorney's unprofessional conduct and the proof of such conduct must be *clear* and *satisfactory.*" *Berlant Appeal,* 458 Pa. 439, 441, 328 A.2d 471 (1974). (emphasis in original) The record supports a finding by clear and convincing evidence that respondent violated Rules 1.15(a), (b), and (c), and 8.4(c) of the Rules of Professional Conduct. The board's respon-

sibility is to determine the appropriate measure of discipline to be imposed on respondent as a consequence of his misconduct. The nature and gravity of the offending conduct, as well as the presence of mitigating or aggravating circumstances, and the existence of a record of prior discipline are factors considered by the board when reaching the ultimate recommendation. Prior case law involving similar misconduct, while not conclusive as to the discipline to be recommended, may be instructive.

The instant case involves the misappropriation of client funds, a serious act of misconduct. The proper handling of client funds goes to the heart of a lawyer's obligations to a client and to mishandle such funds abuses the trust between the lawyer and the client. Relevant case law indicates that there is no per se rule of discipline in Pennsylvania when an attorney engages in mishandling of client funds. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). Precedent establishes that unauthorized dealings with client funds has required some form of public discipline, due to the breach of trust involved. The level of public discipline in such cases depended upon aggravating and mitigating factors. In assessing the proper discipline, the cases frequently considered whether restitution was made, whether respondent demonstrated an appreciable understanding of the nature of the misconduct and how it damaged the trust of the client, and whether a record of prior discipline existed.

In the case of *In re Anonymous No. 44 D.B. 87,* 49 D.&C.3d 488 (1988), an attorney commingled and converted the funds of four different clients and made misrepresentations to those clients concerning the funds. This

attorney received a one-year suspension. Among the factors considered in reaching this sanction were the attorney's lack of prior record, as well as his poor judgment and poor office practices. In the case of *In re Anonymous No. 123 D.B. 90,* 17 D.&C.4th 464 (1992), an attorney who misappropriated estate funds in the amount of $2,300 received a one-year and one-day suspension. This attorney had a prior record. An attorney who misappropriated approximately $4,300 in client funds for 16 months received a two-year suspension. *In re Anonymous No. 132 D.B. 88,* 7 D.&C.4th 331 (1990). In the matter of *In re Anonymous Nos. 79 D.B. 95 and 159 D.B. 95,* no. 373 disciplinary docket no. 3—Supreme Court (1997), as yet unpublished, the attorney commingled and converted approximately $4,600 of client funds for his own use and made misrepresentations to his clients. The board recommended and the court imposed a suspension of one year and one day based on the attorney's lack of prior discipline, the short amount of time the monies were mishandled, and the full reimbursement of the funds.

The facts evidence that respondent has been a licensed attorney in Pennsylvania since 1983 and has no prior record of discipline. Respondent made full reimbursement of the funds to the [A] estate and made a satisfactory refund of the referral fee to Attorney [B]. Respondent understands the extent of his misconduct and the actions he must take in the future to avoid the same problems. He expressed sincere remorse for his actions. Character witnesses testified at the hearing as to the high regard in which respondent is held by fellow attorneys and community members.

The Hearing Committee recommended a suspension of one year. Petitioner took exception to this recommendation and requested that a suspension ranging from three years to disbarment be imposed. Petitioner argued that this was a pure case of conversion of funds with no mitigating circumstances. Petitioner believed a message must be sent that if attorneys engage in such activity, there will be very serious repercussions. Respondent contended that this matter warrants a public censure, with or without probation, or a stayed suspension with probation. Respondent reasoned that this piece of behavior was an aberration involving one client. Respondent fully admitted his wrongdoing and maintains an excellent reputation in his community. Respondent believed that a suspension of one year, as recommended by the committee, or more, as suggested by petitioner, was merely punitive in nature and had no legitimate purpose. Respondent argued that a public censure was an able deterrent and served to protect the public in this matter.

After careful review of the recommendations from the committee, the petitioner and respondent, the board is not persuaded that any of the recommendations are appropriate for this matter, but instead recommends that respondent be suspended for a period of one year and one day. The Hearing Committee recommendation is the most appropriate of those put forward for this situation; however, the board believes that respondent must receive a sanction that obligates him to petition for reinstatement before he is permitted to practice law in the future. While the facts of this case render it less egregious than some other misappropriation cases, the acts engaged in by respondent constitute a very serious breach of trust.

The board would neglect its duty to protect the public and maintain the integrity of the legal profession if a sanction less than a one-year and one-day suspension was recommended.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [  ], be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of one year and one day.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Miller dissents and would recommend a three-year suspension.

## ORDER

Upon consideration of the report and recommendations of the Disciplinary Board dated November 23, 1998, and following oral argument, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of one year and one day, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Chief Justice Flaherty and Mr. Justice Zappala dissent and would suspend respondent for a period of two years.

Mr. Justice Nigro dissents and would suspend respondent for a period of three years.