## In re Anonymous No. 101 D.B. 92

Disciplinary Board Docket no. 101 D.B. 92.

POWELL, *Member,* February 28, 1994—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

A petition for discipline was filed on October 23, 1992, which brought five charges against respondent involving diligence, promptness, keeping a client informed, compliance with reasonable requests for information, delivery of client funds, and conduct prejudicial to the administration of justice. Respondent failed to file an answer to the petition. On October 27, 1992 petitioner filed a motion to consolidate a former petition for discipline encompassing five charges for similar offenses, but the motion was denied by order of November 6, 1992. The former petition, captioned 42 D.B. 92, was the subject of a hearing which was held on October 19, 1992. The Supreme Court

of Pennsylvania accepted the board's recommendation concerning the charges of the former petition captioned 42 D.B. 92 and on October 13, 1993 suspended the respondent from the bar of this Commonwealth for a period of three years.

The instant matter was forwarded to Hearing Committee [    ] chaired by [    ], and included members [    ], and [    ]. The committee received testimony and exhibits at an oral hearing on February 2, 1993 without participation by the respondent. A post-hearing brief from Disciplinary Counsel was received and again respondent chose not to participate in the proceedings against him through the submission of a brief. The Hearing Committee filed its report on April 27, 1993 recommending that respondent should be disbarred from the practice of law. Neither party filed exceptions to the report of the Hearing Committee. This matter was adjudicated at the June 16, 1993 meeting of the Disciplinary Board.

## II. FINDINGS OF FACT

The board adopts the following findings of fact noted by the Hearing Committee, some of which have been stipulated to by the parties and are amply supported by documentary and testimonial evidence:

(1) Petitioner, whose principal office is now located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and

to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was born in 1962, and was admitted to practice law in the Commonwealth on December 3, 1987. He maintains his office at [    ].

## Charge I: [A] Matter

(3) In or around March 1990, complainant, [A], retained respondent to represent her in various domestic relations matters involving her estranged husband. (N.T. at 17.)

(4) Complainant and respondent executed a "fee agreement," which provided that respondent would receive a fee of $300, including costs, for representing complainant in her divorce and related matters. Complainant paid the fee on March 14, 1990. (Stipulation exhibit no. 2.)

(5) On March 21, 1990, respondent filed a consolidated complaint for divorce and custody. An entry of appearance and answer was filed by [B], Esq., on behalf of complainant's estranged husband. (Stipulation exhibits no. 3-5.)

(6) A master was appointed and a review conference regarding custody was held on May 23, 1991. Respondent attended the conference on behalf of complainant. (N.T. 19.)

(7) Although respondent attended two custody proceedings on complainant's behalf, she expressed dissatisfaction with his services in the custody matter because he failed to secure attendance of witnesses or to effectively argue her concerns to the court. (N.T. 25.)

(8) After an additional pre-hearing conference, scheduled for September 26, 1991, an agreement was reached

which concluded the custody matter. The order was entered on October 1, 1991 by Judge [C]. (Stipulation exhibit no. 6.)

(9) At this conference on September 26, 1991, complainant inquired when the divorce would be entered. Respondent advised her that she would receive her divorce decree within two weeks. (N.T. 19.) This was false, as respondent knew or should have known that no affidavits pursuant to 21 Pa.C.S. §§201(c) or (d) had been executed or filed; that they had to be executed within 30 days after they were filed, and that the decree could not be entered until the affidavits were filed.

(10) Since complainant had been separated for more than two years as of September 1991, filing for divorce under 21 Pa.C.S. §201(d) would not be impeded. (N.T. 18.)

(11) Respondent cancelled two appointments which complainant made between September 1991 and January 1992 in order to discuss the divorce. Respondent also failed to return numerous telephone calls made by complainant between January and February of 1992. (N.T. 21-22.)

(12) On February 19, 1992, petitioner advised respondent of a complaint which was being filed against him. He was further advised to communicate with complainant and take action on her divorce within the next 20 days. (Stipulation exhibit no. 7.)

(13) Respondent failed to communicate with complainant or take any action to complete her divorce after February 19, 1992. (N.T. 22.)

(14) Respondent, however, kept an appointment which was made by a friend of complainant under the pretense of being a new client in April 1992. (N.T. 22-23.)

(15) At this meeting respondent told complainant that she would have to amend her complaint to seek a divorce under 23 Pa.C.S. §201(d). Thereafter, complainant terminated respondent's services and demanded return of her file. (N.T. 22-23.)

(16) Respondent failed to return complainant's file or refund any portion of her fee. (N.T. 23.)

(17) The following September, complainant retained other counsel who was able to obtain the divorce in less than six weeks. (N.T. 23; Stipulation exhibit no. 1.)

### Charge II. [D] Matter

(18) On June 27, 1989, complainant, [D], filed a complaint for assumpsit and trespass with [E], District Justice [    ], against [F] Home Builders Inc. and its vice-president, [G]. The complaint sought damages in the amount of $3,296.22 plus costs relating to problems incurred with construction of a home. (N.T. 27; Stipulation exhibit no. 9.)

(19) The district justice rendered a judgment in favor of complainant for the amount of $2,383.11 on August 18, 1989. (Stipulation exhibits no. 9-10.)

(20) On September 15, 1989, [F] filed an appeal with the [    ] County Court of Common Pleas, which was docketed at no. [    ]. A rule to file complaint was issued on that day. (Stipulation exhibit no. 11.)

(21) At this point, complainant retained respondent to represent him in the above action. Complainant paid respondent's requested fee of $250. Although respondent issued a receipt for the sum received, he failed to provide a written fee agreement. (N.T. 27, 31.)

(22) On October 5, 1989, respondent filed a complaint in response to the rule to file complaint. (Stipulation exhibit no. 12.)

(23) Between December 1989 and December 1990, complainant called respondent weekly and scheduled numerous appointments to keep informed about the case. Respondent failed to return calls, keep appointments, or provide complainant with any explanation about the case. (N.T. 34.)

(24) On December 7, 1990, respondent filed a praecipe for appointment of arbitrators. Attorneys [H], [I] and [J] were appointed arbitrators. A hearing was convened on January 11, 1991. (Stipulation exhibit no. 14.)

(25) Respondent met with complainant on the evening of January 10, 1991, at which time he reviewed all of the evidence with respondent, including an estimate from his contractor, [K]. Respondent told complainant for the first time that the presence of [K] would be necessary at the hearing the following day. [K] was out of town, and he was unavailable to attend the hearing the following morning. The arbitration hearing was continued at the request of respondent because [K] could not attend. (N.T. 33, 36.)

(26) Over the next several months, complainant attempted to contact respondent on several occasions, but respondent never returned his calls. Respondent met with him one time, at which point respondent told him that it was the responsibility of the other side to reschedule the hearing, despite the fact that complainants were the plaintiffs and had listed the case for arbitration and sought the continuance. (N.T. 36-37.)

(27) After January 11, 1991, respondent failed to take any steps to reschedule the hearing or to otherwise move the case toward any kind of disposition. (N.T. 37; Stipulation exhibit no. 8.)

(28) Complainant finally terminated respondent's services in January 1992. Complainant eventually recovered the file. (N.T. 37-38.)

(29) Complainant was unable to pursue the matter further due to the expense and has suffered prejudice in delay and inability to collect on a matter for which at one point judgment was obtained for $2,383.11.

### Charge III: [L] Matter

(30) Complainant, [L], retained respondent on March 6, 1989 to represent her in an action to recover damages for serious back and neck injuries which she suffered from an automobile accident on February 21, 1989. (N.T. 105, 106.)

(31) Respondent told complainant that his fee would be one third of any sums recovered; however, he failed to provide a written fee agreement. (N.T. 106.)

(32) On or about March 6, 1989, respondent contacted complainant's insurer, [M] Insurance, to advise them that he was representing complainant. (Stipulation paragraph no. 2.)

(33) On April 10, 1989, complainant was injured in a second accident involving [N], an employee of a sanitation company, and thereafter she retained respondent to represent her in this action. (N.T. 107.)

(34) Respondent failed to answer letters sent to him by insurance claims representatives on December 18, 1989 and February 26, 1990. (Stipulation paragraph no. 3.)

(35) On June 4, 1990, [O], a [M] claims adjustor, requested complainant's medical records from respondent. (Stipulation paragraph no. 4.)

(36) On August 20, 1990, respondent sent some of complainant's records to the insurance adjustor above. Respondent also indicated that he would be sending additional records and would be in a position to discuss settlement within the next month. However, he never sent any further correspondence to [M]. (Stipulation paragraph no. 5.)

(37) Between August and December of 1990, the claims adjustor made several telephone calls to respondent's office, but these calls were never returned. (Stipulation paragraph no. 6.)

(38) Again, the claims adjustor made several telephone calls and left several messages with respondent's office between January and April of 1991, but the calls were never returned. (Stipulation paragraph no. 7.)

(39) In February 1991, complainant, anxious about the statute of limitations with respect to her claims, contacted respondent about the status of her cases. Respondent advised her that he had filed both suits simultaneously to prevent the running of the statute. (N.T. 111-112.) Respondent had not filed any action in reference to the second case.

(40) On February 19, 1991, respondent filed a praecipe for writ of summons in [    ] County Court of Common Pleas, which was docketed *[L] and [P] v. [Q]*, no. [    ]. (Stipulation exhibit no. 15.)

(41) Respondent failed to respond to two other letters written by the claims adjustor on June 15, and August 15, 1991, respectively. (Stipulation paragraph no. 8.)

(42) In October 1991, respondent met with complainant and advised her that even though both of her accident claims had been filed, the defendants disputed the allocation of respective liability for the two accidents, and also that Judge [R] ruled that the two cases could not be tried together. (N.T. 112, 113.) At this point, respondent had not taken any action on the second case, and neither case had been presented to the judge.

(43) On November 5, 1991, the defendant, represented by Attorney [S], filed a praecipe for rule to file complaint, which was served on respondent by letter dated November 7, 1991. Respondent failed to file a complaint or respond otherwise. (Stipulation paragraph no. 9.)

(44) Complainant tried to contact respondent on numerous occasions in late 1991 and early 1992, without success. Respondent failed to return the file when complainant terminated respondent's services on March 16, 1992, and obtained new counsel. Complainant only retrieved her file after appearing unannounced at respondent's office on April 6, 1992. (N.T. 114-116.)

(45) Respondent failed to advise opposing or successor counsel that he had been discharged even after he was reminded of the rule to file complaint by letter of June 24, 1992. Respondent also failed to advise successor counsel of the pendency of the rule. (Stipulation paragraph no. 10.)

(46) Complainant subsequently retained Attorneys [T] and [U], who filed a complaint in response to the rule to file complaint on June 25, 1992. (Stipulation exhibit no. 5.)

(47) [U] testified that his office is continuing to pursue complainant's action, but that her ability to recover was

seriously prejudiced by respondent's failure to file suit for the second accident. [U] stated that it would be difficult to establish that the second accident was not an intervening cause of complainant's injuries because the medical reports indicated that her injuries resulted from both accidents. (N.T. 12-13.)

(48) Complainant's ability to recover on both cases was seriously hampered by respondent's inaction.

## *Charge IV: [V] Matter*

(49) Complainant, [V], the daughter and executrix of the estate of [W] retained respondent in January 1990 to handle the estate. (N.T. 44.)

(50) On February 15, 1990, respondent stated that he would handle probate of the estate for $300 (N.T. 45), and executed a fee agreement and receipt showing that complainant paid his fee in full. Respondent also took out letters testamentary on that same day. (Stipulation exhibit no. 20.)

(51) On April 11, 1990, complainant met with respondent, signed a draft inheritance tax return and gave respondent a check in the amount of $2,709.10 for payment of the estimated inheritance tax. At this time, complainant was entitled to a discount. (N.T. 47, 50; Stipulation exhibit no. 22.)

(52) Respondent failed to pay the inheritance tax and complainant eventually stopped payment on the check. (N.T. 48.)

(53) Around October 1990, complainant contacted respondent about the status of the estate. Respondent told her that he had filed the inheritance tax return and paid the tax. He also claimed that he obtained a receipt from

the register of wills, but that the register lost the papers. This was false because respondent never filed the return, paid the tax, or obtained a receipt. (N.T. 48-49, 61-62.)

(54) Respondent also told complainant that he advertised the estate in the local newspaper, [X] and that the newspaper was to send him a proof. This was false, because respondent never sent an advertisement to the newspaper. (N.T. 60-61.)

(55) On February 11, 1991, respondent met with complainant. At this time, respondent prepared a new tax return and complainant gave respondent check no. 976 drawn on her account at [Y] Credit Union for the amount of $2,709.10 for payment of her estimated inheritance tax. (N.T. 49-50; Stipulation exhibit no. 23.)

(56) In the fall of 1991, respondent advised complainant that he would have to file a tax appeal because the state had been incorrectly informed by a credit union of the interest of the decedent in two accounts. Respondent never gave complainant further information on this matter. When she offered to get corrective statements, respondent told her that he would handle the matter. However, he never obtained the statements. (N.T. 52.)

(57) Respondent failed to keep several appointments that complainant made between February and December of 1991. (N.T. 53.)

(58) Complainant finally dismissed respondent by letter dated March 25, 1992. (N.T. 54; Stipulation exhibit no. 24.)

(59) Respondent returned the file, but it did not contain the uncashed checks given to him nor any information which indicated that respondent performed any work other than the initial calculations. (N.T. 55.)

(60) Due to respondent's failure to pay the inheritance taxes, complainant received delinquency notices and also a notice from the state, which threatened to attach wages if the tax was not paid. (N.T. 56.)

(61) Complainant was forced to complete the tax work without counsel. When she paid the inheritance tax on April 8, 1992, she had to pay interest in the amount of $472.28, as well as losing a credit in the amount of $249.69. She suffered a total loss of $721.97. (Stipulation exhibit no. 25.)

(62) Complainant also suffered financial prejudice from paying $350 in fees.

### Charge V: [Z and AA] Matter

(63) On April 4, 1989, complainants, [Z] and [AA], asked respondent to represent them in an action against defendant [BB] for injuries arising from an automobile accident which occurred on March 11, 1989. At this meeting complainants paid respondent $50 towards filing fees in their case.

(64) Respondent, however, failed to provide a written agreement for his contingent fee of 25 percent of any recovery. (N.T. 66; Stipulation exhibit no. 27.)

(65) When complainants learned that defendant's insurance carrier might be liable despite defendant's failure to pay his premiums, they informed respondent, who failed to investigate this possibility. (N.T. 78-79.)

(66) Complainants made approximately 10 telephone calls and office visits with respondent between April and August of 1989. Respondent cancelled several of these appointments. (N.T. 69.)

(67) Respondent falsely told complainants that he had sent two certified letters making demands to the defendant. When complainants requested copies, he failed to provide any. (N.T. 70.)

(68) On August 22, 1990, respondent filed a praecipe for writ of summons in [    ] County, which was docketed as *[Z] v. [BB]*, no. [    ]. (Stipulation exhibit no. 29.)

(69) On August 30, 1990, respondent filed a complaint and notice in the above case in order to seek property damages for the loss of complainants' automobile. The complaint also alleged that the defendant was operating his vehicle in violation of the Motor Vehicle Financial Responsibility Law because defendants' motor vehicle insurance at the time of the accident had been cancelled. The complaint requested damages not in excess of $10,000. (Stipulation exhibit no. 29.)

(70) Complainant did not sign the affidavit to verify the complaint, and verification was not attached to the complaint. (N.T. 74; Stipulation exhibit no. 29.)

(71) After filing the complaint, respondent did not take any further action on the case. (Stipulation exhibit no. 26.)

(72) By letter dated December 11, 1990, [CC], a claims adjustor from defendant's insurance company, the [DD] Insurance Group, requested respondent contact him about the possibility of reaching a settlement. (Stipulation paragraph no. 12.)

(73) The claims adjustor did not recall any settlement negotiations with respondent, and believed at one point he advised respondent that his company was not going to accept responsibility because defendant's policy had

been cancelled in February 1989 and the accident occurred in March 1989. (Stipulation exhibit no. 30; Stipulation paragraphs no. 12-14.)

(74) In January 1991, complainants met with respondent in his office, and he told them that he received a call from an insurance representative who offered to settle the claim for $4,000 with a $1,000 settlement for the automobile. However, respondent told complainants that he refused the offer and intended to push for a settlement of $8,000, to which they agreed. (N.T. 69.)

(75) On February 14, 1991, respondent filed two praecipes for writ of summons, docketed at *[AA] and [Z], her husband v. [BB]*, no. [    ] and *[Z] and [AA], his wife v. [BB]*, no. [    ], [    ] County. No action exists on record after the sheriff filed a return of service on February 21, 1991. (Stipulation exhibits no. 31, 32).

(76) When complainants met with respondent in March 1991, respondent gave them the impression that the insurance company offered a settlement of $8,000, but that he intended to seek amounts between $10,000 and $11,000. During this meeting, complainants requested written copies of these settlement offers, but respondent told them that all communication was made by phone. (N.T. 81, 90.)

(77) Even though complainants repeatedly accepted respondent's settlement offers, he insisted that he would present further offers to opposing counsel. (N.T. 82, 90.)

(78) For the next several months, complainants called respondent several times, but respondent failed to return their calls and cancelled each meeting on short notice. (N.T. 84-85.)

(79) Complainants' son, [EE], an attorney for the [FF] Board, requested respondent by letter dated March 22, 1992 to provide him with copies of all information regarding his attempts to settle the claims. Respondent failed to respond to this letter. (Petitioner's exhibit no. 2.)

(80) Again the son contacted respondent by letter dated April 27, 1992. Respondent failed to reply. (Petitioner's exhibit no. 3.)

(81) Complainants never formally terminated their relationship with respondent, but their son arranged for them to meet with another attorney to determine what remedies they may have. (N.T. 97-98.)

(82) [DD] Insurance Company does not have any record that anyone extended any offers of settlement regarding the complainant's claims for personal injury and property damage, as the company took the position that it would not be liable because the defendant's policy was cancelled a month prior to the accident. (Stipulation paragraph no. 14.)

(83) Complainants suffered prejudice because their recovery for property damages and injuries was delayed for nearly three years, along with an opportunity to negotiate a settlement with defendant's insurance policy.

In addition the board finds that:

(84) Respondent has a prior record of discipline resulting in a suspension by the Supreme Court from the practice of law in the Commonwealth of Pennsylvania for a period of three years.

(85) Respondent is the subject of two lawsuits and a federal tax lien.

(86) Respondent does not carry malpractice insurance and does not have assets which execution could issue.

## III. CONCLUSIONS OF LAW

Respondent has violated the following Rules of Professional Conduct as a result of the five charges listed above:

(a) R.P.C. 1.2(a), which requires a lawyer to consult with a client concerning the objectives of the representation and abide by the client's decision;

(b) R.P.C. 1.3, which requires a lawyer to act with reasonable diligence and promptness in representing a client;

(c) R.P.C. 1.4(a), which requires a lawyer to keep a client reasonably informed about the status of a matter and to promptly comply with reasonable requests for information;

(d) R.P.C. 1.5(b), which requires a lawyer who has not regularly represented the client to communicate in writing the basis or rate of the fee before or within a reasonable time after commencing the representation.

(e) R.P.C. 1.5(c), which requires a contingent fee agreement in writing which shall state the method by which the fee is to be determined;

(f) R.P.C. 1.15(b), which requires a lawyer to promptly deliver to a client any funds or other property that the client is entitled to receive and shall promptly render a full accounting regarding such property;

(g) R.P.C. 1.16(d), which requires a lawyer to take steps to the extent reasonably practicable to protect a client's interests upon termination of the representation;

(h) R.P.C. 8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; and

(i) R.P.C. 8.4(d), which prohibits a lawyer from engaging in conduct that is prejudicial to the administration of justice.

## IV. DISCUSSION

It is well established that the primary task in disciplinary matters is "to protect the public from unfit attorneys and to maintain the integrity of the legal profession and the judicial process." *In re Oxman,* 496 Pa. 534, 544-45 437 A.2d 1169, 1174 (1981), citing *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981). Disciplinary procedures have been established "as a catharsis for the profession and a prophylactic for the public." *Lewis, supra* at 528, 426 A.2d at 1142. Thus, "disciplinary sanctions are not primarily designed for their punitive effects, but for their positive effect of protecting the public and the integrity of the courts from unfit lawyers." *Office of Disciplinary Counsel v. Tumini,* 499 Pa. 284, 288, 453 A.2d 310, 312 (1982), quoting *In re Berlant,* 458 Pa. 439, 441, 328 A.2d 471, 473 (1974) and *Office of Disciplinary Counsel v. Costigan,* 526 Pa. 16, 24, 584 A.2d 296, 300 (1990). Furthermore, it is incumbent on the disciplinary system to preserve the public confidence in the legal profession and the judicial system. *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 402, 441 A.2d 1197, 1200 (1982). Accordingly, the court focuses upon "the impact of [respondent's] conduct upon the system and its effect on the perception of that system by the society it serves." *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 584, 506 A.2d 872, 878 (1986).

The respondent's past conduct resulted in the Supreme Court of Pennsylvania suspending him on October 13

from the bar of this Commonwealth for a period of three years after having found a pattern of severe neglect occurred concerning his representation of five clients.

His present conduct again focuses on five additional complaints displaying a pattern of severe neglect, combined with numerous incidents of misrepresentations, nonresponsiveness, and apparent abandonment of practice. Since respondent was admitted to the bar in 1987, the total time period encompassed by these charges spans a period greater than one-half of his brief legal career.

Three violations are paramount throughout the previously adjudicated and present client complaints:

(1) Lack of diligence as well as neglect of cases, which resulted in prejudice through clients' lawful objectives;

(2) Unresponsiveness to clients' legitimate inquiries into status of cases; and

(3) Misrepresentations intended to mislead clients to believe that respondent took action on their cases.

Determining the continued fitness of an attorney to practice law can only be made after viewing the totality of the circumstances. *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 484, 345 A.2d 616, 622 (1975). While isolated instances of misconduct can be insufficient to support disbarment, "a number of instances, although unrelated, when considered together, can demonstrate such complete disregard for professional standards that disbarment is necessitated." *Id.*

Prior cases establish that disbarment is the appropriate sanction when the evidence shows patterns of severe neglect, combined with numerous incidents of misrepresentation and apparent abandonment of practice. *In re Anonymous 12 D.B. 79,* 14 D.&C.3d 388 (1980);

*In re Anonymous No. 51 D.B. 80,* 19 D.&C.3d 769 (1981); *In re Anonymous No. 34 D.B. 80 and 15 D.B. 81,* 22 D.&C.3d 254 (1981).

Although there are cases in which respondents have been censured or suspended for cases of neglect complicated by misrepresentation, almost all of these were based on smaller numbers of incidents or involved mitigating factors, and do not reflect the pattern of abandonment of practice and indifference to disciplinary inquiry that are evident here.

Respondent here chose not to participate in the disciplinary process, thus offering no mitigation for these actions and therefore abandoning himself as well as his clients. Moreover, respondent's failure to appear in or defend the disciplinary matter is a legitimate and significant aggravating factor. *In re Anonymous No. 130 D.B. 88,* 10 D.&C.4th 508, 515 (1990), and *In re Anonymous No. 15 D.B. 81,* 22 D.&C.3d 254, 261 (1981). Additionally aggravating is respondent's failure to maintain malpractice insurance or to otherwise provide financial security for clients with legitimate claims.

Recognizing that disbarment is the most serious form of disciplinary discipline it is our responsibility, nevertheless, to protect the public and preserve public confidence in the legal profession and the judicial system. Respondent's repeated misconduct without mitigation and aggravated by his failure to defend necessitate a recommendation by this board of disbarment.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be disbarred from the practice of law in the Commonwealth of Pennsylvania.

It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Mr. Kerns and Ms. Flaherty did not participate in the adjudication.

## ORDER

And now April 20, 1994, upon consideration of the report and recommendations of the Disciplinary Board dated February 28, 1994, it is hereby ordered that [respondent] be and he is disbarred from the bar of this Commonwealth, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is furthered ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Frank J. Montemuro is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket no. 94 R1800 due to the unavailability of Mr. Justice Rolf Larsen, see no. 127 Judicial Administration Docket no. 1 filed October 28, 1993.